Roszines MITCHELL, Plaintiff,

v.

FAB INDUSTRIES INC., and in their professional capacities Marsha Cohen, Yves Mahe, and Marshall Schwartz, Defendants.

No. 96 Civ. 0095(RWS).

United States District Court,
S.D. New York.

Jan. 9, 1998.

Ingrid N. Davis, Brooklyn, NY, for Plaintiff.

Doar, Devorkin & Rieck, New York City (Christopher E. Chang, of counsel), for Defendants.

## OPINION

SWEET, District Judge.

Defendant Fab Industries, Inc. ("Fab") has moved for summary judgment pursuant to Rule 56 to dismiss the complaint of its former employee, plaintiff Roszines Mitchell ("Mitchell"), against Fab and three supervisors in their individual capacities for employment discrimination based on sex and religious discrimination and retaliatory discharge pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). For the reasons set forth below defendants' motion is denied in part and granted in part.

### Parties

Mitchell is a resident of New York City.

Fab is a domestic textile manufacturer located at 200 Madison Avenue, New York City.

Defendant Marsha E. Cohen ("Cohen") is the Personnel Director for Fab.

Defendant Marshall Schwartz ("Schwartz") is the Production Manager of the Raval Lace Department at Fab.

Defendant Yves Mahe ("Mahe") is Supervisor of the Raval Lace Department at Fab.

### Prior Proceedings

On June 7, 1993, Mitchell filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that she had been sexually harassed, subjected to religious discrimination and that she had been fired in retaliation for serving a summons upon her employer in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq. ("Title VII"). On June 29, 1993, the State Division of Human Rights ("SDHR") determined that there was no probable cause to believe that the defendants engaged in the alleged discriminatory behavior and that there was insufficient evidence to support Mitchell's contention that she had been fired in retaliation for her discrimination complaint. Mitchell's complaint was filed on December 26, 1996.

On June 5, 1996, defendants moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. On July 25, 1996, the Court dismissed four of the plaintiff's seven claims.[1] Mitchell v. Fab Industries Inc., et al., No. 96 Civ. 0095, 1996 WL 417522, at *1 (S.D.N.Y.1996). Defendants then made the instant motion for summary judgment to dismiss Mitchell's remaining three claims as barred by the statute of limitations and, alternatively, on the grounds that she has not established a prima facie case of discrimination or retaliation. The claims as against the individual defendants Cohen, Mahe and Schwartz must be dismissed as a matter of law. Oral argument was waived, and the motion was deemed fully submitted on October 1, 1997.

---

1. The four claims that were dismissed were racial and national origin discrimination, negligent infliction of emotional distress, intentional infliction of emotional distress and assault and battery.

*Facts*

From November 27, 1989 through May 4, 1993, Mitchell was employed by Fab, a manufacturer of textiles. Initially, Mitchell was assigned to work as a telex clerk in the fax department where her responsibilities involved filing and copying. Mitchell's supervisor was Cohen, head of the Personnel Department. Under Cohen, Mitchell received excellent yearly evaluations on her job performance. Based on these positive evaluations, Mitchell was approved for either a bonus or raise or both for each consecutive year from 1989 through 1991. In April 1991, Mitchell was asked to be a floater—to split her time between two departments. During the first half of the day Mitchell continued to work as a telex clerk under the supervision of Cohen, and during the latter half of the day she worked as a data entry clerk in the Raval Lace Department under the supervision of Schwartz.

According to Mitchell, in April 1991, two weeks after she was assigned to Raval Lace, Schwartz asked Mitchell to view a religious statue located in the office of Richard Gross ("Gross"), the Vice President of the Company. When Mitchell entered his office, she saw a statue of a man with an elongated penis. Mitchell, a licensed Pentecostal Missionary, expressed to Schwartz her dislike of the statue. Co-workers Yvette Sherrill ("Sherrill") and Nancy Phillips ("Phillips") were present during the interchange. Schwartz then inquired whether Mitchell had a boyfriend and, if she did, whether his penis was the same size. Mitchell immediately reported this incident to Gross. Gross handled the matter by telling Schwartz in Mitchell's presence that she did not like to be told to look at the statue and then said "you know she is a nice church girl." Mitchell contends that throughout that year Schwartz frequently teased Mitchell about the statue.

In January 1992, Mitchell returned to the fax department on a full-time basis through March 1992 while renovations were taking place. Mitchell was not under Schwartz' supervision during this period, and no incidents are alleged to have occurred.

When renovations were completed in March 1992, Mitchell returned to Raval Lace on a part-time basis. At the same time, Mitchell was in the process of being trained to fill in for Sherrill. Sherrill was preparing to go on maternity leave in May 1992. Mitchell eventually assumed Sherrill's duties as the order entry clerk and was assigned to Raval Lace full-time. The position involved new responsibilities that required Mitchell be trained on the computer. Schwartz told Mitchell that when Sherrill returned from maternity leave in the fall, Mitchell would remain the order entry clerk, and Sherrill would assume Mitchell's former position as the fax clerk. However, upon return from maternity leave in September 1992, Sherrill requested that she resume her position as order entry clerk. As a result of the confusion in job responsibility, Mahe called a meeting with Schwartz, Mitchell and Sherrill. Mahe settled the confusion by deciding that Sherrill would remain the order entry clerk and Mitchell would return to filing.

From September through October 1992, Mitchell was on sick leave recovering from foot surgery. When Mitchell returned in October 1992, the doctor recommended that Mitchell either be placed on short-term disability, or be given assignments that did not require her to walk. Schwartz ignored the doctor's request and assigned Mitchell work that required all-day standing and walking.

On December 11, 1992, Mitchell received her fifth work performance evaluation, this time filled out by Mahe. While the evaluation noted that "Mitchell needed to catch up a little bit," it nevertheless stated that "Mitchell did her work" and suggested that she be given both a bonus and a salary increase.

In late December 1992, Mitchell reported that Schwartz directed religious profanity at her with phrases such as "Jesus, Jesus, f____ you, kiss my ass" and stuck his tongue out at her. According to Mitchell, this occurred because she caught Schwartz falsely reporting to Mahe that she had not finished her work. Mahe had responded by agreeing to resolve the matter in the New Year. As Mitchell returned to her desk, Schwartz followed and began cursing at Mitchell using the same religious profanity. Mitchell immediately reported this to Mahe who again re-

sponded that he would resolve it in the New Year. Mahe never addressed either incident.

On January 28, 1993, Mitchell submitted a memorandum to Cohen complaining of the treatment she received from Schwartz and Phillips. Mitchell reported that on one occasion Phillips had lost her temper when Mitchell left early for the day even though Mitchell had already notified Schwartz and Mahe that early departure would be necessary. The memorandum further documented Schwartz' use of vulgar language such as "f___", and Schwartz' complaints that Mitchell walked too slowly, ate at her desk, went to the bathroom too often and made excessive phone calls. In addition, Mitchell was informed by two co-workers, Minnie Swetman and Noel McBeen, that Schwartz and Phillips ordered them not to speak to Mitchell.

On January 29, 1993, Schwartz submitted a memo in response. In his memo Schwartz complained of Mitchell's insubordinate behavior and her lack of enthusiasm. Schwartz believed that any disagreement that existed between him and Mitchell began after Sherrill returned from maternity leave and stemmed from jealousy between the two women. In addition, Schwartz reported that he had received complaints about Mitchell from other employees in the department. Schwartz requested that Mitchell be transferred to another department.

On February 10, 1993, Sherrill submitted a memo to Cohen regarding difficulties she had encountered with Mitchell since Sherrill's return from maternity leave. Sherrill claimed that arguments with Mitchell had centered around Mitchell's inability to complete her work and Sherrill's efforts to assume Mitchell's neglected responsibility.

On February 16, 1993, Schwartz submitted a second memo to Cohen complaining that Mitchell informed him that she would be out from work, but had refused to give an explanation.

On March 11, 1993, Mitchell submitted another memo to Cohen reporting a fourth incident. In this memo, Mitchell alleged that Schwartz threw work on her desk and yelled at her to get the work out right now. When Mitchell informed Schwartz that she was no longer required to do Phillip's work, Schwartz responded, "Bitch get this work out right now before I take my hand and pull all those curls off your head." Mitchell then asked Schwartz not to use profanity. Schwartz responded by laughing and sticking out his tongue at her. Mitchell further alleges other types of profanity Schwartz directed at her such as "f___ you," "kiss my ass" and "bitch." Mitchell noted that Schwartz' treatment of Mitchell was different from that of other employees at Fab. On March 17, 1993, Schwartz submitted a third memorandum contesting Mitchell's allegations in her March 11 memo. Schwartz stated that he never used profanity, nor stuck his tongue out at her and that what he had said was "get this out as soon as possible." In Schwartz' April 29, 1997 deposition, he admits that he may have called Mitchell a "bitch." Schwartz denies that he knew Mitchell was Pentecostal or that she was religious.

On March 21, 1993, Mahe sent the first of two warnings to Mitchell regarding complaints he had received about her from co-workers. Mahe claimed to have listened to both sides and concluded that the problem could be resolved if Mitchell completed her work on time. Mahe also included a list of Mitchell's duties and noted those in which Mitchell lagged behind.

On March 22, 1993, Schwartz submitted a fourth memo complaining that Mitchell gave Schwartz half an hour's notice that she was leaving early that day. On March 25, 1993, Schwartz submitted another memo to Cohen complaining that Mitchell notified him on Wednesday March 24, 1993 at 4:26 pm both verbally and with a note that she would not be in the next day, thus leaving him insufficient time to find a replacement.

On April 20, 1993, Mitchell received a second warning from Mahe regarding Mitchell's refusal to enter work orders because of the late hour. Moreover, Mahe recommended that Mitchell follow Schwartz' instructions and direct her complaints to Schwartz rather than Mahe.

On April 20, 1993, according to Mitchell, there had been one work order with which she needed assistance entering in the computer. The work order needed a new code

number which required a different process, one that Mitchell had only once completed with the assistance of Schwartz. Mitchell asked Schwartz to show her how to enter the new code. Schwartz refused to assist Mitchell saying that he was sure that she remembered how to enter the new code. Mitchell then returned to her cubicle with Schwartz following her. While seated at her desk, Schwartz turned around and shook his buttocks in Mitchell's face. Mitchell told Schwartz to stop while holding her head back to avoid contact. Schwartz then turned around and called her a "bastard" and returned to his desk. Mitchell managed to record part of the incident on tape. Afterwards, Mitchell reported the incident to Mahe and asked for a transfer. Mahe told Mitchell that there would be no transfer. According to Mitchell, these incidents caused her physical illness which interfered with her ability to perform her job. As a result, Mitchell had to be prescribed medication.

On April 24, 1993, Mitchell reported the April 20 incident to her local police precinct. The officers told her that the incident had to be reported to the precinct in the area where the incident occurred. In the late afternoon on April 26, 1993, Mitchell reported the incident to the appropriate precinct. She was referred to the Institute for Mediation and Conflict Resolution. On April 27, 1993, a summons was served upon Schwartz to appear at the Institute for a mediation and conflict resolution session on May 3, 1993. On May 3, due to a conflict in schedule of Mitchell's attorney, the session was postponed until May 19, 1993. On May 4, 1993, seven days after the summons was served, Mitchell received a termination notice. The reason given for termination was a reduction in labor force and poor work performance. As a result of Mitchell's termination, the May 19 mediation session was cancelled.

On June 8, 1993, Mitchell filed a complaint with the Equal Employment Opportunity Commission ("EEOC") claiming sexual and religious discrimination and retaliation for filing a complaint with the Institute for Mediation and Conflict Resolution and serving a summons upon the defendants. On October 26, 1995, after an investigation was conduct-

ed, the EEOC determined that Mitchell's claim lacked probable cause. Mitchell requested and received from the EEOC a Notice of Right to Sue which gave her the right to file a civil action within 90 days of receipt of the letter.

On January 5, 1996, Mitchell commenced this instant action asserting sex and religious discrimination and retaliation in terminating Mitchell's employment for serving defendants with a summons.

### Discussion

Fed.R.Civ.P. 56(c) provides that a motion for summary judgment may be granted when "there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Tomka v. Seiler,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City University of New York,* 894 F.Supp. 750, 757 (S.D.N.Y.1995) (citing *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *Burrell,* 894 F.Supp. at 758 *(citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

### Claims Against Employees in Their Individual Capacity Are Dismissed

■ Claims against individual supervisors should be dismissed as a matter of law. In *Tomka,* 66 F.3d at 1314, the Second Circuit held that individual defendants, including those with supervising capacity, could not be held personally liable for alleged violation of Title VII. The Second Circuit reasoned that Congress did not intend to allow civil liability to run against individual employees for this would not have comported with Congress' intent to protect small employers from liability and from the burden associated with liti-

gating discrimination. A finding of agent liability, moreover, would require courts to differentiate among agents with the power to hire and fire from supervisors without these powers. *Tomka,* 66 F.3d at 1314.

### The Statue Incident Is Time–Barred

■ Title VII requires persons aggrieved by an employer's discriminatory acts or practices to file a complaint with the EEOC within 180 days of such acts or practices. 42 U.S.C. § 2000e–5(e). However, in states such as New York which have established a local agency to facilitate Title VII claims, the claimant may file a complaint within 300 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1). Title VII filing requirements begin to run when the employee knew or should have known of the allegedly discriminatory act.

In the present case, there is no dispute that the April 1991 statue incident occurred over two years before Mitchell filed her EEOC complaint—well beyond the EEOC's 300–day limitation period. Mitchell contends, however, that the April 1991 viewing of the statue should not be barred since the incident in connection with the harassment was ongoing and thus was part of a continuous violation of her rights.

■ The Second Circuit does recognize, under limited circumstances, a continuing violation exception to the EEOC time limitation. *Riedinger v. D'Amicantino,* 974 F.Supp. 322, 325 (S.D.N.Y.1997). "If a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir. 1993) (citing *Cook v. Pan Am. World Airways, Inc.,* 771 F.2d 635, 646 (2d Cir.1985)).

■ A continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specified and related instances of discrimina-

tion are permitted by the employer to continue unremedied for so long as to amount to a discriminatory practice." *Riedinger,* 974 F.Supp. at 325 (citing *Lambert,* 10 F.3d at 53) (discriminatory seniority list or employment tests constituted ongoing discriminatory policy or practice); *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994) (court found a continuing violation where plaintiff suffered race and gender-based harassment that the defendant company and its supervisory personnel permitted to continue unremedied for so long as to amount to a discriminatory practice).

■ "Generally, courts have looked unfavorably on continuing violation arguments... Indeed, only 'compelling circumstances' will warrant application to the exception to the statute of limitations." *Riedinger,* 974 F.Supp. at 325 (citing *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989)). The continuing violation exception applies only in cases involving specific, ongoing policies or practices, such as discriminatory seniority lists or employment tests. *Lambert,* 10 F.3d at 53 (holding that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation"); *Riedinger,* 974 F.Supp. at 325.

■ The incidents alleged by Mitchell do not amount to a specific "policy or practice." Mitchell states in her deposition that the teasing by Schwartz in reference to the April 1991 statue incident ended in December 1991. The second alleged discriminatory act, where Schwartz directed religious profanity at Mitchell such as "Jesus, Jesus, f___ you, kiss my ass" and stuck his tongue out at her, did not occur until December 1992, over a year later. While part of the time lapse between incidents can be explained by Mitchell's transfer to Raval Lace for several months in 1992 and her absence post-surgery,[2] there was still a period of over seven months where Mitchell was under Schwartz' supervision and where no incidents were re-

2. From January through March 1992, Fab underwent renovations, and as a result Mitchell was sent back to her old department. From

September through October 1992, Mitchell was on sick leave due to required foot surgery.

ported. Under these circumstances, the teasing cannot be considered ongoing. Finally, there is no evidence that the specific and related instances of discrimination were permitted by the employer to continue unremedied for so long as to amount to a discriminatory practice. To the contrary, according to Mitchell's own affidavit, she reported the incident to the Vice President, Gross, who promptly responded. In Mitchell's presence, Gross specifically told Schwartz that Mitchell did not like to be told to look at the statue. Thus, the April 1991 statue incident, insofar as it relates to Mitchell's Title VII claims, is time-barred.

### Mitchell Has Established a Prima Facie Case of Sexual And Religious Discrimination

■ In an employment discrimination action, the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *Rieff v. ITT Communication and Information Services,* No. 93 Civ. 1457, 1994 WL 658426, at *2 (S.D.N.Y. Nov. 18, 1994) (citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "At the prima facie stage, a plaintiff's burden of proof is de minimis." *Dister v. Continental Group,* 859 F.2d 1108, 1114 (2d Cir.1988). If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse action. Should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Rieff,* No. 93 Civ. 1457, 1994 WL 658426, at *3 (S.D.N.Y. Nov. 18, 1994).

■ Fab maintains that the incidents of harassment alleged by Mitchell are insufficient to establish a *prima facie* case of hostile work environment based on sex or religious discrimination. Harassment based on sex or religion which creates a hostile or abusive work environment violates Title VII. To prevail on a hostile work environment claim, Mitchell must show that "the work-

place is permeated with discriminatory intimidation, ridicule and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment," *Tomka,* 66 F.3d at 1305, and "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM· Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). To decide whether a hostile work environment exists, a finder of fact must consider the totality of the circumstances which may include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Riedinger v. D'Amicantino,* 974 F.Supp. at 327 (citing *Tomka,* 66 F.3d at 1305, n. 5). In order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. "Isolated remarks will not merit relief under Title VII." *Id.*

■ The following incidents comprise Mitchell's allegations of sex and religious discrimination. On December 31, 1992, Mitchell asserts that Schwartz repeatedly directed the following religious profanity at her, "Jesus, Jesus, f____ you, kiss my ass," and then stuck his tongue at her. Mitchell had reported this incident to Schwartz' supervisor, Mahe. According to Mitchell, Mahe agreed to handle the matter in the New Year, but never did. In a January 28, 1993 memorandum sent to Cohen, Mitchell documents that on the day before Schwartz had cursed at her using the word "f____" several times. In a March 11, 1993 memorandum addressed to Cohen, Mitchell documents that on that very day Schwartz had called Mitchell a "bitch", threatened to pull the curls out of her head and then stuck his tongue out at her. On April 20, 1993, Mitchell reported that Schwartz called Mitchell a "bastard" and shook his buttocks in her face. These incidents occurred within a period of four months, and were severe and pervasive enough to have cumulatively altered the condition of Mitchell's work environment. *Riedinger,* 974 F.Supp. at 327. In a hostile work

environment claim, harassed employees are only held to a standard of reasonableness. "Whenever the harassment is of such a quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII so long as the employee subjectively experienced a hostile work environment." *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997). A reasonable Pentecostal missionary could find a workplace in which her supervisor repeatedly yelled at her "Jesus, Jesus, f__ you, kiss my ass" a hostile environment.

Defendant contends that some of the incidents such as being called a "bitch" or a "bastard" are remarks which many people would not consider overly offensive. While being called a "bastard" alone may not be so considered, such epithets enjoined with offensive physical gestures such as Schwartz' thrusting of his buttocks in Mitchell's face, must be found physically threatening and humiliating. *Riedinger*, 974 F.Supp. at 327. Moreover, these actions appear to have been based, at least in part, on Mitchell's gender. There is no evidence that Schwartz referred to male workers as "bitch", threatened to pull their hair out, or suggested that they "kiss his ass", or shook his buttocks in their face. In *Dortz v. City of New York*, the court found that comments the defendant directed at plaintiff such as "the frustrated bitch," or "passive-aggressive" were clearly sexual or gender-related and taken together with nine other comments created a hostile work environment. 904 F.Supp. 127, 149 (S.D.N.Y.1995). Similarly, the verbal harassment Schwartz directed at Mitchell that encompassed both gender-related and religious overtones along with Schwartz' physical gestures can reasonably be termed pervasive enough to have created a hostile work environment. Finally, the fact that Mitchell was required to work under the supervision of Schwartz within the same department could be viewed as intensifying the severity of Schwartz's conduct. *See Id.*

According to Mitchell, these incidents caused her physical illness which interfered with her ability to perform her job. As a result, Mitchell had to be prescribed medication. Mitchell's physical condition which

resulted from Schwartz' conduct further allows a finding that a hostile work environment existed.

Once Mitchell has met her burden of establishing a *prima facie* case of discrimination, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse action, in this case terminating Mitchell's employment. Fab asserts that Mitchell was not qualified for her position and that her termination resulted from complaints about her work performance. Fab points to written complaints submitted regarding Mitchell's poor work performance, and asserts that, as a result of these complaints, Fab determined that Mitchell was not qualified. Although Fab admits that written complaints were not issued until after Mitchell's January 1993 memorandum regarding her supervisors' treatment of her, Fab contends that oral complaints began three months earlier in September 1992.

Mitchell has set forth evidence sufficient to demonstrate that she possessed the basic skills necessary for the performance of the job. *de la Cruz v. New York City Human Resources Admin. Dept. Of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir.1996). She received excellent evaluations from 1989 to 1991. In the Summer of 1992, upon the request of Schwartz, she was transferred to Raval Lace to fill in for Sherrill who was out on maternity leave. Upon Mahe's request, Mitchell was initially transferred to Raval Lace on a full-time basis. Schwartz wanted her to remain in that department even after Sherrill returned. Although Mitchell was told in a 1992 evaluation that she needed to catch up a bit, the evaluation nevertheless stated that she did her work and suggested that she be given a raise and bonus. Moreover, during the period that Mitchell had been assigned to Raval Lace to replace Sherrill, she had to acquire new job responsibilities and had been trained on the computers.

Mitchell further contends that the barrage of complaints submitted against her occurred after her January 28, 1993 memorandum complaining of Schwartz' treatment of her. In fact, according to Mitchell, Schwartz admittedly told her that his complaint was in

retaliation for hers. Prior to that, there were no complaints regarding Mitchell's qualifications for her position. Furthermore, all of the complaints were submitted by Schwartz, the person accused of the discriminatory conduct. While there was one complaint submitted by Sherrill, the two women were in fact competing for the same position within Raval Lace. Thus Sherrill's complaint must be viewed with some skepticism. The two warnings Mitchell received from Mahe, must also be viewed critically because they resulted from complaints submitted by Schwartz and Sherrill.

Mitchell has met her burden of proving the existence of factual issues demonstrating that the stated reasons for the adverse employment action were not its true reasons, but were merely a pretext for discrimination.

### Title VII Retaliatory Discharge

To establish a *prima facie* case of retaliation under Title VII, the employee must demonstrate that (i) the employee was engaged in an activity protected under Title VII, (ii) the employer was aware of the plaintiff's participation in the protected activity, (iii) the employee suffered adverse employment decisions and (iv) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. The requisite causal connection may be established if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause. *Burrell*, 894 F.Supp. at 758, 759 (citing *Tomka*, 66 F.3d at 1308).

In the present case, Mitchell clearly satisfies the first and third prongs of the *prima facie* test. Mitchell was engaged in a protected activity on April 27, 1993 when she filed a complaint with the Institute for Mediation and Conflict Resolution and when she had an officer serve a summons upon Fab that same day. Mitchell suffered an adverse employment decision when Fab terminated her employment on May 4, 1993, thus meeting the third prong of the test. As for the second prong, it is well established that filing a formal agency complaint such as the one filed by Mitchell with the Institute

for Mediation and Conflict Resolution and serving a summons upon the defendant constituted a protected activity. *Riedinger*, 974 F.Supp. at 327 (filing an internal complaint is a well established protected activity); *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) (filing a formal complaint with an agency constitutes protected activity under Title VII); *See Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 65 (2d Cir.1992) (court found that, although plaintiff did not file a formal complaint filing an internal complaint, opposing harassment constituted protected activity under Title VII). Fab was informed that Mitchell was engaged in a protected activity when they were served with the summons for the mediation; the summons alleged harassment and interpersonal dispute as the conflict. Mitchell has also adduced sufficient evidence to establish a causal connection between the protected activity and the adverse employment action. It is undisputed that Fab terminated Mitchell seven days after the summons was served and one day after the initial scheduled mediation session. "A causal connection can be established through such indirect evidence of close proximity in time." *Riedinger*, 974 F.Supp. at 329; *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996) (causal connection established where time between the plaintiff's initial complaint and her discharge was a mere twelve days) (citing *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988)).

### Conclusion

For the reasons stated above, defendants' motion for summary judgment is granted as to the liability of individual defendants and otherwise denied.

It is so ordered.