**Marquita DURANT, Plaintiff,**

v.

**NYNEX and Bell Atlantic Corporation, Defendants.**

**No. 98 CIV. 2740(SHS).**

United States District Court, S.D. New York.

June 21, 2000.

---

Phillipe Regis Dussek, New York City, for plaintiff.

Matthew T. Miklave, Epstein Becker & Green, P.C., New York City, Joy D. Oberman, Ronald G. Burden, Saul Scheier, Joy D. Oberman, New York City, for defendants.

*OPINION*

STEIN, District Judge.

Pro se plaintiff Marquita Durant is a Seventh Day Adventist who charges that her employer, NYNEX, discriminated against her by refusing to accommodate her religious observances and retaliated against her on the basis of her religion. Durant alleges that this violated 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, New York State Executive Law §§ 290 *et seq.* and the New York City Administrative Code §§ 8–101 *et seq.*

Defendants have moved for summary judgment on all claims. As set forth below, defendants' motion is granted on the grounds that (1) Durant has not stated a claim of religious discrimination or retaliation pursuant to Title VII because NYNEX took no adverse employment action against her, (2) NYNEX reasonably accommodated her religious beliefs, (3) Durant was not subject to a hostile work environment on account of her religion, (4) Durant's claim for racial discrimination pursuant to Title VII is procedurally barred, (5) Durant has not stated a claim for discrimination in violation of 42 U.S.C. § 1981, and (6) her New York state law claims are dismissed on similar grounds.

## I. Background.

### A. Plaintiff.

Durant, as a member of the Seventh Day Adventist Church, observes the Sabbath as a day of rest, beginning at sunset on Friday and continuing until sunset Saturday. *See* Miklave Aff. Exs. H & I.

NYNEX[1] hired Marquita Durant on July 7, 1987 to work as a Directory Assistance Operator. She continued in that job until June 1996, when NYNEX promoted her to the position of Customer Service Administrator ("CSA"). *See* Miklave Aff. Ex. K. She is currently on a leave of absence for unrelated medical reasons.

### B. Scheduling Problems Begin.

Prior to Durant's promotion to Customer Service Administrator, NYNEX was able to arrange her schedule so that her shifts would not conflict with her observance of the Sabbath. Customer Service Administrators, however, are regularly assigned to tours that cover various periods from Monday through Saturday, including nights and Saturdays.

As part of her new responsibilities, in June of 1996 Durant began a five week training course which met Monday through Friday from 4pm until midnight. For the term of the training course, NYNEX permitted Durant to leave early on Friday. The training course did not require Saturday shifts. *See* Def. Statement ¶ 8. During July and August, Durant worked a "probation" schedule which only required weekday shifts.

In order to try to avoid any future scheduling conflict, plaintiff notified her union representatives, NYNEX's EEO representative, and her new supervisor, Louis DeMartino, that her religious beliefs prevented her from working on Friday night or Saturday. DeMartino explained that the department operates rotating tours, including Friday nights and Saturdays, and that he could not make an exception for her because then everyone else would want special days off. *See* Durant Aff. Ex. F. (EEOC Aff. Dated March 26, 1997). DeMartino told her that she should accept a demotion and return to her old job if she could not work on Saturdays. *See* Miklave Aff. Ex. K. Durant claims that her union representatives and the company's EEO representative never investigated her right to a reasonable accommodation despite her inquiries. *See id.*

In the beginning of September 1996, Durant was inserted into the regular CSA schedule. *See* Durant Aff. ¶ B.1. The CSAs' collective bargaining agreement ("CBA") committed NYNEX to assign CSA night shifts on a rotating basis to all CSAs with fewer than 25 years of experience. *See* Miklave Aff. Ex D. Saturday daytime shifts are assigned as night shifts according to longstanding union and NYNEX policy. *See* Fitch Aff. ¶ 22.

Pursuant to the CBA, NYNEX must offer CSAs equal overtime opportunities. *See* Fitch Aff. ¶¶ 20 & 21. CSAs who are offered overtime are "charged" for the overtime, regardless of whether they actually work the overtime, and are then

---

1. On August 14, 1997, NYNEX merged with Bell Atlantic Corporation, and is currently a wholly owned subsidiary of Bell Atlantic. *See* Defendants' Rule 1.9 Statement.

moved to the bottom of the "order of call" list. *See* Fitch Aff. ¶ 23.

NYNEX's manager in charge of scheduling, Michael Casale, excused Durant's first regular-shift absence in September 1996. *See* Miklave Aff. Ex. K. Two weeks later, plaintiff was again scheduled for a Saturday shift. She reminded Casale about the conflict with her religious beliefs and he "shrugged his shoulders," allegedly saying "do what you have to do and we'll do what we have to do." Durant arrived at work four hours tardy, was marked late and docked pay for the time period she did not work. *See* Miklave Aff. Ex. K. At approximately this time, Casale allegedly asked Durant if she was Jewish in a tone which Durant found "condescending." *See* Durant Aff. ¶ B.10.

NYNEX continued scheduling Durant to work on Saturdays every other week. *See* Miklave Aff. Ex. K. Durant both swapped her assignments with other employees and used her vacation days to avoid absences. *See* Miklave Aff. Ex. K. Eventually, she decided it was unfair for her to use her vacation time to avoid being marked late or absent. *See* Durant Dep., at 210. On four occasions, plaintiff failed to take vacation time or find replacements for her Saturday shifts, and therefore accumulated four Sabbath-related latenesses. *See* Miklave Aff., Ex. U.

NYNEX issued "disciplinary warnings" pursuant to the attendance policies it administers—the Absence Control Plan ("ACP") and the Tardiness Control Plan ("TCP"). *See* Fitch Aff. ¶¶ 3–17; Miklave Aff. Ex M & N. Both plans impose a six-step progressive corrective scheme ending in termination of employment. An unapproved absence will result in progression of one step pursuant to the ACP. The employee will "retrogress" back one step after three months, unless the employee has another unexcused absence in which case he or she will progress to the next step. An employee who reaches Step VI will be terminated. The TCP operates in a similar manner based upon the length and frequency of latenesses.

These latenesses, in conjunction with other latenesses unrelated to her Sabbath observances, resulted in Durant's progression in March of 1997 to step V under the TCP. DeMartino then warned Durant that one more lateness would cause NYNEX to sever her from the payroll. *See* Durant Aff. Ex. F (E.E.O.C. Complaint dated March 26, 97).

In addition, on various occasions, NYNEX offered Durant overtime shifts on Saturday as required by its CBA. She declined to accept those shifts, and NYNEX "charged" her for them and put her on the bottom of the "order of call" list as required by its CBA. Durant believes that the repeated offers of Saturday overtime constituted "continued harassment" and "belittled" her beliefs. *See* Durant Aff. ¶ B.8.

## C. The Alleged Plan to Have Durant "Retreat" to Her Former Position.

Durant charges the administration of the lateness policy was part of a plan by DeMartino to force her to "retreat" to her former position of Directory Assistance Operator. Durant cites a note by DeMartino stating that "by 11/1 we must make a decision to retreat her." *See* Durant Aff. Ex. K. According to Durant's theory, DeMartino kept diligent notes on her absences and latenesses and the manager assigned to mark employees late watched Durant "like a hawk," marking her for latenesses of only two minutes. *See* Durant Aff. ¶¶ 3–4. Although Durant claims that the tardiness of other employees was never recorded, she has never produced the notes she allegedly took regarding these latenesses and does not dispute the accuracy of NYNEX documents showing that other employees were in fact marked for latenesses as short as two minutes. *See* Miklave Aff. Exs. A & K.

Offended by the inconsistency of the NYNEX lateness policy, Durant circulated

an office petition protesting its inconsistent application. *See* Durant Aff. ¶ B.4; Durant Dep., at 666–680. Durant contends that the collective bargaining agreement requires NYNEX to write up every employee who arrives late, despite an informal policy negotiated with the union that DeMartino had the discretion to excuse an occasional lateness of a usually punctual employee. Durant felt the policy was unfair, since "I think everybody that's late is supposed to be written up," and NYNEX management "should not have that much authority." Durant Dep., at 668; Durant Aff. Ex. E (Petition).

Durant has a history of unexcused latenesses and absences even apart from her Sabbath conflict. Plaintiff's absence record had previously resulted in her progression to Step V of the ACP and progressive discipline under the TCP. *See* Miklave Aff. Exs. Q & R. During the period beginning September 1, 1995 and ending May 1, 1997, plaintiff was absent on four occasions and tardy a total of 33 times, *see* Miklave Aff. Exs. A, K, & R–U, although none of these absences or latenesses was related to her Sabbath observances.

In October 1996, Durant filed a grievance with her union complaining about NYNEX's failure to accommodate her religious beliefs. Durant charges that months passed without the union taking any action on the grievance.

### D. Durant Complains and NYNEX Accommodates Her.

In late March 1997, Durant filed a flurry of three complaints: On March 21 she filed a grievance with the NYNEX Human Relations department and explained her troubles with DeMartino regarding her Sabbath observance. *See* Durant Aff. Ex. I. Four days later, Durant filed a charge with the NLRB stating that the union was not processing her earlier grievance in a timely fashion. *See* Miklave Aff. Ex. U. An Acting Regional Director of the NLRB later concluded that there was insufficient evidence of any NLRA violation to justify issuing a complaint, since the evidence indicated that the union and the employer were processing the grievance. *See* Durant Aff. Ex. M. Durant appealed his refusal to issue a complaint.

Two days after filing the NLRB charge, Durant filed a complaint with the New York State Division of Human Rights and the EEOC, alleging that NYNEX discriminated against her on the basis of her religion because DeMartino failed to excuse Durant from work during the Sabbath hours. *See* Miklave Aff. Ex. Z. It neither alleged nor set forth the basis of a race discrimination claim. The complaint requested (a) removal of all disciplinary steps imposed and (b) a commitment not to schedule Durant for work that conflicts with her Sabbath observance.

One month later, the parties resolved the grievance she had filed with the NYNEX Human Relations Department. On April 28, 1997, NYNEX advised plaintiff that it would remove all steps issued against her that were related to her Sabbath observances, including latenesses. *See* Miklave Aff. Ex K; Durant Aff. ¶ 11. *See* Miklave Exs. K, T & Y. In addition, a coworker agreed at one of the grievance sessions to swap Saturday shifts with plaintiff when possible. *See* Miklave Aff. Ex. K. As a result, Durant moved from Step V—"final warning status"—to Step III. She retrogressed only to Step III because she had non-Sabbath related latenesses.

NYNEX claims, and Durant does not dispute, that it offered Durant various accommodations, allowing her to swap her shifts, to utilize her vacation days and personal times, or to return to her previous position as a Directory Assistance Operator.

### E. Durant Alleges that the Harassment Continues

The resolution did not last. Shortly after all steps against plaintiff related to her Sabbath observance had been removed,

Durant had a verbal altercation with Casale. Casale approached Durant in a hallway near her office and asked her if she wished to work an overtime shift on Saturday. She ignored Casale and walked away from him. Casale again approached Durant and asked for an answer. Durant jumped up, telling Casale to "get out of my face," and then called the police. According to plaintiff, Casale uttered unspecified racial slurs in the presence of the police. *See* Durant Aff. ¶¶ B.8–B.10. In her complaint, Durant had claimed that Casale told her that she used words which could only be understood in her "hood." In her deposition, Durant instead stated that Casale asked her whether the term "in your face" was from her "neighborhood." *See* Durant Dep., at 368. Durant had also called an ambulance, but when it never came the police took her to Coney Island Hospital. *See id.*, at 374. The police apparently told her that Casale did not make any threats, though she claimed to feel intimidated. *See* Durant Aff. ¶ B.9.

Durant charges that the incident reflects ongoing harassment by NYNEX because Casale knew that she was a Sabbath observer and offered her the overtime shift solely to antagonize her. She also charges that Casale would sometimes ask her repeatedly whether she wanted to work Saturday overtime, and then tell her he was "only kidding." *See* Miklave Aff. Ex L, at ¶ 12. NYNEX states that Casale was simply following his obligation under the CBA to offer overtime in rotating shifts to all eligible employees, a suggestion that Durant dismisses stating that she had previously offered to sign a statement preventing him from offering her overtime on the Sabbath. *See* Durant Aff. ¶ B.8. NYNEX denies that Durant made any such offer to waive her rights under the CBA. *See* Reply Memo., at 5–6.

After the altercation with Casale, Durant left work on disability leave to receive psychological care she states she required as a result of the altercation with Casale. *See* Durant Aff. ¶ B.11. She also requested a transfer to the Manhattan office. *See, e.g.,* Miklave Aff. Ex. X.

**F. Durant's Final Leave of Absence**

Durant returned to work in November 1997, and NYNEX honored her request to be transferred to its Manhattan office. *See* Durant Aff. ¶ 12.

Durant believes that the harassment continued. The basis for her belief is apparently that she was not given "her computer codes" and two managers asked her to work Saturday overtime. *See id.* She was also assigned to work on rotating Saturdays, but told that she did not have to work those shifts and would not receive a salary for them. *See id.*

In April 1998, she suffered an unrelated back injury caused by a defective chair. *See id.*, at ¶ B.15. She continued working until August 30, 1999, when the pain became too severe to sit for a nine-hour shift. *See id.* Plaintiff remains on leave of absence.

She filed the complaint in this action on April 16, 1998. In the complaint, she asserts that she has suffered from insomnia, loss of appetite and emotional distress as a result of her discriminatory treatment.

**II. Discussion.**

**A. Summary Judgment Standard.**

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quoting Fed.R.Civ.P. 56(c)); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen,* 64 F.3d at 79 (citation omitted) (quoting *Lund's, Inc. v.*

*Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989)).

Since Durant is proceeding pro se, this Court will hold her pleadings to "less stringent standards than formal pleadings drafted by lawyers ...." *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). Her supporting papers have been read liberally and interpreted "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

## B.  Title VII Claim.

### 1.  Discrimination Claim.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) provides that:

"(a) It shall be an unlawful employment practice for an employer ... (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

Accordingly, "an employer cannot discriminate against any employee on the basis of the employee's religious beliefs unless the employer shows that he cannot 'reasonably accommodate' the employee's religious needs without 'undue hardship on the conduct of the employer's business.' " *Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476, 481 (2d Cir.1985) (citing 42 U.S.C. § 2000e(j)).

■ A plaintiff alleging religious discrimination bears the initial burden of establishing a prima facie case of discrimination. Specifically, the plaintiff must show (1) that she has a bona fide religious belief that conflicts with an employment requirement, (2) that she informed her employer of this belief, and (3) that she was disciplined for failure to comply with the conflicting employment requirement. *See Philbrook,* 757 F.2d at 481. Once the prima facie case has been made, the burden shifts to the employer to show that either it made reasonable accommodations or that it could not make reasonable accommodations without undue hardship on the conduct of its business. *See Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68–69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986).

■ Durant has not established a prima facie case of religious discrimination because she was never disciplined for her failure to work on the Sabbath. A plaintiff must show that she has suffered an adverse change in the conditions of her employment. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Although NYNEX did impose "disciplinary steps" against her pursuant to the Tardiness Control Plan for her latenesses associated with observance of the Sabbath, these steps were only warnings and were removed in April 1997, over one year prior to the filing of this lawsuit. "Negative evaluations alone, without any accompanying adverse result, however, are not cognizable." *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 283 (S.D.N.Y. 1999). *But see Vergara v. Bentsen,* 868 F.Supp. 581, 592–93 (S.D.N.Y.1994). Durant has never alleged that the imposition of these steps caused NYNEX to take any action against Durant or influenced any of its decisions.

■ Even had Durant alleged a prima facie case of religious discrimination, NYNEX offered Durant reasonable accommodations. "[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end." *Ansonia,* 479 U.S. at 68, 107 S.Ct. 367. NYNEX told Durant that she may swap shifts on an ongoing basis and use vacation days to cover for her shifts which conflict with the Sabbath. NYNEX has indeed done so, excusing

plaintiff's prior absences and permitting her to use vacation time and to swap shifts—which she has done.

As a matter of law, NYNEX's accommodations are reasonable. In *Ansonia,* the U.S. Supreme Court wrote that "requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one." 479 U.S. at 70, 107 S.Ct. 367. The U.S. Court of Appeals Second Circuit has written approvingly of an employer's accommodating an employee by permitting voluntary shift swaps. *See Genas v. State of N.Y. Dep't of Correctional Serv.,* 75 F.3d 825, 832 (2d Cir.1996).

Moreover, Durant has never asserted any factual matter which questions the reasonableness of these accommodations. She has only intimated that it would be unfair to require her to use her vacation time when NYNEX could just excuse her from working Saturday shifts. *See* Durant Dep., at 210. This Court need not determine whether Durant's proposed alternative accommodation is reasonable, since Title VII only requires that the employer propose a reasonable accommodation and does not require that the employer offer the specific accommodation the employee seeks. *See Ansonia,* 479 U.S. at 69, 107 S.Ct. 367.

### 2. Hostile Work Environment.

In order to prevail on a hostile work environment claim, a plaintiff must show "(1) that [the] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant,* 80 F.3d at 715 (quoting *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

The requirement that the workplace be "permeated with discriminatory intimidation" entails both an objective and a subjective aspect. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Durant has alleged facts demonstrating her subjective impression of the severity of the intimidation, leaving the question of whether the environment was objectively hostile. In the context of sexual discrimination, the Supreme Court has articulated a list of non-exclusive factors to be considered, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating; (4) whether the conduct interfered with plaintiff's work and (5) the existence of psychological harm. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367.

The lion's share of Durant's claim of harassment is hardly the result of religious discrimination at all. Durant states that she felt harassed by her supervisors' periodic offering of overtime shifts on Saturdays, which at times were made in a "belittling" manner. Her supervisors contend that they were complying with union requirements when they offered her these shifts. None of these claims support the notion that Durant's supervisors were attacking her because of her religion or belittling her religion. In fact, the one concrete event that Durant reports as insulting was when Casale asked her "in a condescending tone" whether she was Jewish. Regarding the intimidation she felt when she called the police to escort her to the hospital, Durant found that event so upsetting because her supervisor was "in her face," not because he made any demeaning comments about her church. *See* Durant Aff. ¶ B.9.

■ Durant does not charge that anyone at her work place made profane comments about her faith, coerced her to engage in religious activity, insulted her religion, or even mentioned her religious beliefs. *Cf. Mitchell v. Fab Indus. Inc,* 990 F.Supp. 285, 292–293 (S.D.N.Y.1998); *Shabat v. Blue Cross Blue Shield,* 925 F.Supp. 977, 984–985 (W.D.N.Y.1996);

*Rosen v. Baker, III,* 1995 WL 264169, at *7 (E.D.N.Y. May 1, 1995). Insofar as her supervisors allegedly misbehaved, that behavior does not amount to religious discrimination and did not create an environment "permeated with discriminatory intent."

### 3. Race Discrimination Claim.

■ Durant has also asserted discrimination on the basis of race. Raising a charge of racial discrimination in her EEOC complaint is a procedural prerequisite to filing a Title VII action. *See, e.g., Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Since Durant's EEOC petition never mentions her claim of racial discrimination or the facts that allegedly buttress it, this claim is barred. The discussion below of her claim pursuant to 42 U.S.C. § 1981 also demonstrates that she has not set forth any facts that could support a claim pursuant to Title VII.

### 4. Retaliation Claim.

Analyzing a claim of retaliation in violation of Title VII involves the burden shifting scheme familiar to Title VII discrimination claims. "A prima facie case of retaliation under Title VII requires the plaintiff to show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995)). Having established a prima facie case, the burden shifts to the defendant to demonstrate legitimate reasons for its actions. The burden then returns to the plaintiff to establish that the asserted explanation is pretextual for the true discriminatory motive. *See id.*

■ As a primary matter, it appears that Durant believes the retaliation followed her circulating a petition protesting

the NYNEX lateness policy. That petition did not involve her race or religion, and she was not trying to assert her Title VII rights. The petition protested the grant of discretion to NYNEX management to excuse latenesses. In short, circulating this particular petition was not a protected activity.

Even had NYNEX reacted to Durant's complaints of religious discrimination, it never took any adverse employment action. Durant's absences and latenesses were excused. Durant has not alleged that she was fired or denied any promotion. Durant has not met her *de minimis* burden of demonstrating a prima facie case of retaliation.

### C. Section 1981 Claim.

"To establish a claim under [42 U.S.C.] § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute . . . ." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam). The statute's enumerated rights include the ability to make and enforce contracts, which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Second Circuit has "emphasize[d] that an essential element of [the] cause of action is a requirement that the alleged discrimination took place because of the individual's race." *Mian,* 7 F.3d at 1088.

Plaintiff's sole basis for a charge of racial discrimination is the verbal altercation with Michael Casale. In her affidavit, Durant charged that Casale uttered racial slurs in the presence of the police officers she had called. In her complaint, Durant had claimed that Casale accused her of

using words which could only be understood in her "hood," but in her deposition she instead stated that Casale asked her whether the term "in your face" was from her "neighborhood."

█ A reasonable juror cannot conclude from this comment alone that Casale had an intent to discriminate against Durant on the basis of her race. A single ambiguous comment is insufficient to establish intent to discriminate. Moreover, Durant never alleges that Casale or NYNEX made an adverse employment decision. At best, Durant has alleged a claim of racial harassment, but her allegations could never prove that "the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987). She only alleges one incident whose link to race is tenuous. All of her remaining harassment claims relate to religious discrimination, and so are not cognizable pursuant to section 1981. This claim is dismissed.

### D. State Law Claims

Durant's claims under New York State Executive Law §§ 290 *et seq.* and the Human Rights Laws of the New York City Administrative Code §§ 8-101 *et seq.* are also dismissed. New York courts applying these statutes require the same standard of proof as claims brought pursuant to Title VII. *See Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997).

### III. Conclusion.

For the reasons set forth above, defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56 is granted and judgment should enter dismissing the complaint.