Norman E. BENNETT, Jr., Plaintiff,

v.

WATSON WYATT & COMPANY,
Defendant.

No. 00 CIV. 491(SAS).

United States District Court,
S.D. New York.

March 14, 2001.

238

Joan Franklin Mosley, New York City, for Plaintiff.

Amber L. Kagan, Brian D. Buckstein, Morgan, Lewis & Bockius LLP, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Norman E. Bennett, Jr. brings this action against his former employer

alleging race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 (" § 1981"), and the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"). Plaintiff also brings claims of retaliation and constructive discharge. The discriminatory acts of which plaintiff complains include: (i) failure to provide him with salary increases; (ii) exclusion from the performance evaluation process; (iii) denial of compensation communication meetings; (iv) unfair scrutiny of his tardiness; and (v) underutilization of his services. Defendant moves for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. For the following reasons, defendant's motion is granted and the case is dismissed.

## I. FACTS

Watson Wyatt & Company ("Watson Wyatt") is an international consulting firm that provides consulting services in the areas of employee benefits, human resources technologies, and human capital management. *See* Affidavit of Elizabeth Ross, Manager of Finance and Administration at Watson Wyatt ("Ross Aff.") ¶ 2. Watson Wyatt has approximately 80 offices and employs over 5,500 people worldwide. *Id.* ¶ 3. Plaintiff is a black man. *See* Amended Complaint ("Cmpl.") ¶ 2.

Bennett joined Watson Wyatt's Retirement Department as a full-time administrative assistant on April 22, 1996. *See* Deposition of Norman E. Bennett ("Bennett Dep."), Ex. B to the Affidavit of Amber Kagan ("Kagan Aff."), defendant's attorney, at 39. Administrative assistants are responsible for typing, assisting with client presentations, and keeping the calendars/schedules for the consultants and analysts for whom they work. Ross Aff. ¶ 4. In 1996, Watson Wyatt hired seven administrative assistants, including Bennett, of whom five were black, one was Hispanic and one was white. *Id.* ¶ 5. The highest paid assistant was Pauline Williams–Greasley, a black woman hired at an annual salary of $36,000. *Id.* The remaining six assistants were hired at an annual salary of $33,000. *Id.* At the time plaintiff was hired, his scheduled hours were 9:00 a.m. to 6:00 p.m., with a one-hour lunch break.[1] Bennett Dep. at 53, 56.

Plaintiff's first year at Watson Wyatt was uneventful. Plaintiff received an above-average review from his manager and a pro-rated raise of $600. *See* Year-End Feedback Form, Ex. I to Kagan Aff.; Bennett Dep. at 109–10. There was, however, an incident in May of 1997. On May 29, 1997, the Regional Retirement Practice Leader, Eric Lofgren, asked plaintiff if he could assist him in making changes to a client presentation in the absence of his regular assistant, Pauline Williams–Greasley. Bennett Dep. at 116–17. Plaintiff responded that he could. *Id.* The presentation was for Nabisco, one of Watson

---

1. Plaintiff claims that one of his managers, Jim Marple, informed him that Watson Wyatt offered flex-time and that he could come in after 9:00 a.m. as he often stayed past 6:00 p.m. *See* Affidavit of Norman E. Bennett, Jr., ("Bennett Aff.") ¶ 12. In that same affidavit Bennett swore that his hours were 9:00 a.m. to 6:00 p.m. with one hour for lunch. *Id.* ¶ 3. In his deposition, which pre-dated his Affidavit, plaintiff testified that he and Marple did not agree to hours other than 9:00 a.m. to 6:00 p.m. *See* Bennett Dep. at 56. This Court must accept as true plaintiff's earlier deposition testimony as a litigant may not "create an issue of fact by submitting an affidavit in opposition to a summary judgement motion that, by omission, or addition, contradicts the affiant's previous deposition testimony." *Hayes v. NYC Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir.1996). In any event, the criticism of plaintiff's tardiness by various Watson Wyatt employees, *see infra*, refutes any notion that plaintiff was on flex-time.

Wyatt's biggest clients. *Id.* at 125. Lofgren believed the project would take plaintiff no longer than one hour to complete, *see* Deposition of Eric P. Lofgren ("Lofgren Dep."), Ex. C to the Kagen Aff., at 42, and instructed plaintiff that the presentation needed to be revised and sent to Nabisco by 11:00 a.m. the next day. Bennett Dep. at 124. The deadline was originally noon but was moved to 11:00 a.m. Lofgren Dep. at 47, 50.

Bennett was unable to complete the project by 11:00 a.m. or by noon. Bennett Dep. at 122; Lofgren Dep. at 42. Despite repeatedly assuring Lofgren that the project would be done soon, plaintiff spent more than six hours on it. Lofgren Dep. at 42. Ultimately, Lofgren reassigned the project to another assistant who helped plaintiff complete the presentation. *Id.* Lofgren was very unhappy about missing the deadline and viewed the entire incident as a "horrible catastrophe." *Id.* In fact, about a month later, Jim Marple informed plaintiff that Lofgren wanted to fire him over the incident. Bennett Dep. at 146–47. Plaintiff was not fired although Lofgren recommended that he not receive a raise in 1997 as a result of his performance. Lofgren Dep. at 41. This recommendation was executed by two of Watson Wyatt's staff, Howard Peyser and Howard Fine. *See* Deposition of Howard Peyser, Ex. J to the Declaration of Joan Mosley, plaintiff's attorney, in Opposition to Summary Judgment ("Mosley Decl."), at 18–19; Deposition of Howard Fine, Ex. J to Mosley Decl., at 58–59. Plaintiff disputes that the problem was with his performance and insists that it was with Lofgren's percep-

tion of his performance. Bennett Dep. at 128.

Shortly after the Nabisco incident, plaintiff began arriving late for work, often arriving between 9:30 and 10:00 a.m. Bennett Dep. at 200–01. Plaintiff admits that he was frequently counseled by Watson Wyatt regarding his lateness. *Id.* at 227, 276, 375, 388–89, 418–19, 430. *See also* Ex. K to the Kagen Aff. (various correspondence outlining plaintiff's habitual lateness). Plaintiff was also counseled for submitting inaccurate time reports which resulted in payment for hours not worked. *Id.* at 431. Despite being repeatedly counseled, plaintiff continued to arrive late for work even though he was warned that continued lateness could result in his termination. *Id.* at 433. The following is a brief synopsis of plaintiff's counseling sessions.

- On March 12, 1998, plaintiff met with Jack Schechter, a consultant for whom he worked, for what Schechter described as a "PDP" meeting.[2] Bennett Dep. at 194. Elizabeth Ross joined them in this meeting. *Id.* During this meeting, plaintiff's lateness was discussed. *Id.* at 199–201. *See also* Ex. K to the Kagan Aff. This meeting was memorialized in a memorandum from Ross to plaintiff which indicated that plaintiff frequently came to work at 10:00 a.m. or later and often took more than one hour for lunch. *See* June 15, 1998 Ross Memorandum, Ex. J to the Bennett Aff.

- In April of 1998, plaintiff met with Jim Marple who informed him that other consultants had the expectation that

---

**2.** Watson Wyatt utilizes a performance assessment tool called the Performance Development Process ("PDP"). The PDP is an employee-initiated process designed to assist employees in developing their goals and assessing their performance against those goals. *See* July 11, 1996 Memorandum from Peter

Grunthal, Ex. D to the Kagan Aff.; Ross Aff. ¶ 12. The PDP includes setting goals, gathering feedback, and assessing performance. Ross Aff. ¶ 12. In addition, the PDP includes ongoing discussions between employees and the managers for whom they work. *Id.*

plaintiff would report for work by 9:00 a.m. Bennett Dep. at 227.

- On June 23, 1998, plaintiff met with Kathy Davi and Sung Pasquale, a consultant. Another meeting was held on June 24, 1998 which was attended by Elizabeth Ross. *See* June 24, 1998 Memorandum from Kathy Davi, Ex. K to the Kagan Aff. These meetings were a follow-up to the March 12 meeting. *Id.* at 3. At the June 24 meeting, Ross informed plaintiff that his team members remained displeased about his lateness, excessive lunch breaks, and excessive personal phone calls and Internet usage. *Id.*

- On September 16, 1998, plaintiff again met with Pasquale and David Fleiss, another consultant, for what Pasquale described as plaintiff's 1998 fiscal year review. Bennett Dep. at 362. During this meeting, Pasquale informed plaintiff that his punctuality needed improvement. *Id.* at 375. Plaintiff was told that if he continued to arrive to work late he would be terminated. *Id.* at 388. Despite this warning, plaintiff continued arriving late for work. *Id.* at 388–89.

- On November 17, 1998, plaintiff met with Barry Drexler, Watson Wyatt's newly hired Human Resources Manager. *Id.* at 418. During that meeting, Drexler told plaintiff that his lateness problem had been brought to his attention. *Id.* Drexler then asked plaintiff if there was any reason why plaintiff could not report to work by 9:00 a.m. to which plaintiff responded in the negative. *Id.; see also* December 15, 1998 Memorandum from Barry Drexler, Ex. K to the Kagan Aff., at 1. Although Drexler informed plaintiff that he had to be at his desk, ready to work, by 9:00 a.m., plaintiff still came in late. Bennett Dep. at 418.

- On March 26, 1999, Fleiss and Robert Lista, a consultant, met with plaintiff to discuss his tardiness. *Id.* at 430–31. During that meeting, Fleiss and Lista addressed their concern that plaintiff was submitting inaccurate time reports, which plaintiff admitted to doing, and that such conduct was unacceptable. *Id.* at 431. At the end of the meeting, plaintiff was warned that if he continued to arrive late for work, he would be terminated. *Id.* at 433. This meeting was memorialized in an informal memorandum from Lista to plaintiff. *See* Ex. K to the Kagan Aff.

- On September 27, 1999, plaintiff was approached by Fleiss and Lista who provided plaintiff with a memorandum setting forth his performance deficiencies. *See* September 27, 1999 Memorandum from Fleiss, Ex. K to the Kagan Aff. These included coming to work late, not working the full eight hours, excessive personal telephone calls, and being away from his desk without explanation. *Id.* at 1–2. This memorandum was plaintiff's final warning that if he came to work past 9:00 a.m. or failed to work an eight hour day, he would be terminated. *Id.* at 3.

Despite these numerous admonitions, plaintiff's pay was never docked, nor was he ever suspended, as a result of his lateness. Bennett Dep. at 388. In fact, other than the counseling sessions, Watson Wyatt took no other disciplinary actions against plaintiff. *Id.* Indeed, plaintiff received salary increases in 1998 and 1999 despite his lateness problem. Ross Aff. ¶ 10. Plaintiff continued to work at Watson Wyatt until March 18, 2000, when he resigned. Bennett Dep. at 608. Plaintiff alleges that Watson Wyatt "escalat[ed] its negativity towards plaintiff" forcing him to resign "to free himself from the increasing

and unceasing hostility under which he worked daily."[3] Cmpl. ¶ 19.

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law[,]' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir.2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. See Parkinson v. Cozzolino, 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.' " Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000) (quoting Anderson, 477 U.S. at 256, 106 S.Ct. 2505). However, the non-moving party may not "rest upon … mere allegations or denials." St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir.1999), cert. denied, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal quotation marks, citations, and alterations omitted).

"The salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." Nicastro v. Runyon, 60 F.Supp.2d 181, 183 (S.D.N.Y. 1999) (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988)). However, greater caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue. See Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir.1999). This is so because "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbid-

---

**3.** Plaintiff alleges that since he filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in May of 1998, he experienced an escalating pattern of harassment and retaliation. See Bennett Aff. ¶ 28. Plaintiff claims that Jim Marple stopped speaking to him after he filed his EEOC charge, id. ¶ 26, and that a member of Marple's team, Rowena Mohammed, told another associate that plaintiff was a "bad assistant." Bennett Dep. at 561. In addition,

after the EEOC charge was filed, a succession of people began commenting on plaintiff's punctuality. Bennett Aff. ¶ 26. Drexler, in particular, instructed plaintiff to sign in with the receptionist when he arrived at work, Bennett Dep. at 418, and personally checked plaintiff's arrival time. Bennett Aff. ¶ 26. Finally, plaintiff alleges that he was yelled at in the workplace by Davi, Pasquale, Fleiss, Drexler and Lista on several occasions and that Fleiss and Lista assaulted him. Id. ¶¶ 26, 28.

den by law." *Bickerstaff,* 196 F.3d at 448 (internal quotation marks and citation omitted, brackets in original). But even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

## III. APPLICATION TO PLAINTIFF'S CLAIMS

### A. *McDonnell Douglas* Burden–Shifting Analysis

 The Supreme Court has "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory treatment cases." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Where, as here, the plaintiff has not alleged any direct evidence of discrimination, he must proceed under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] Under this analysis, the plaintiff must first prove a prima facie case of discrimination. *See id.; see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the plaintiff makes out a prima facie case, the burden of production shifts to the employer to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr.,* 509 U.S. at 509, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at

254, 101 S.Ct. 1089). If the defendant produces such evidence, "the presumption raised by the prima facie case is rebutted, and drops from the case." *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742. Although the presumption of discrimination drops from the case, the "trier of fact may still consider the evidence establishing plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089). Thus, plaintiff's prima facie case, combined with sufficient evidence of pretext, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves,* 120 S.Ct. at 2109.

 Despite these shifting burdens, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 2106 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). In other words, "once a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n,* 233 F.3d 149, 156 (2d Cir.2000). In determining whether the plaintiff can satisfy this ultimate burden, a court examining the entire record must apply a case-by-case approach. *See*

---

**4.** Plaintiff's discrimination claims, brought under Title VII, section 1981 and the NYSHRL, are all analyzed using the *McDonnell Douglas* framework. *See Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 317 n. 2 (2d Cir.1999) (N.Y.SHRL claims); *Lopez*

*v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987) (section 1981 claims). Plaintiff's retaliation claim is also subject to *McDonnell Douglas. See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996) (Title VII).

*Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000).

## B. Plaintiff's Prima Facie Case

In order to make out a prima facie case of discrimination, a plaintiff must establish that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination. *See Stern v. Trustees of Columbia University*, 131 F.3d 305, 311–12 (2d Cir.1997) (citing *Burdine*, 450 U.S. at 253 & n. 6, 101 S.Ct. 1089). The burden of proof that a plaintiff must meet at the prima facie stage in order to survive summary judgment is de minimis. *See Dister*, 859 F.2d at 1115. Nonetheless, a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995). Although plaintiff meets the first element because he is black, he fails to meet the other three elements for the following reasons.

### 1. Qualified for the Position

If plaintiff can prove a constructive discharge, he will be deemed terminated for purposes of his prima facie case. *See Ternullo v. Reno*, 8 F.Supp.2d 186, 190 (N.D.N.Y.1998). Assuming, *arguendo*, that plaintiff could prove constructive discharge, his termination claim would nonetheless fail because he was not qualified for his position. In a different Title VII case brought by plaintiff against another former employer, Judge Allen G. Schwartz found that plaintiff's "lateness rendered him unqualified [as] his ongoing problem with punctuality did not satisfy defendant's legitimate expectations of its

employees." *Bennett v. Morgan Stanley & Co., Inc.*, No. 96 Civ. 6071, 1999 WL 165713, at *4 (S.D.N.Y. Mar.25, 1999) (citing *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 30 (2d Cir.1997) ("[A] plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance in accordance with the particular employer's criteria for satisfactory performance.")). Many courts have reached the same conclusion. *See, e.g., Gomez v. Pellicone*, 986 F.Supp. 220, 227 (S.D.N.Y.1997) (plaintiff's chronic tardiness alone defeated her prima facie case). Furthermore, plaintiff's lateness is a legitimate, nondiscriminatory reason for his discharge. *See Brown v. City of New York*, No. 94 Civ. 7090, 1998 WL 67657, at *3–4 (S.D.N.Y. Feb.18, 1998) (excessive tardiness provided a legitimate, nondiscriminatory reason for plaintiff's termination); *Sanyer v. Kimberly Quality Care*, 971 F.Supp. 86, 89 (E.D.N.Y.1997) (defendant provided legitimate, nondiscriminatory reason for plaintiff's termination which was due to her lateness and her submission of inaccurate time sheets). Accordingly, plaintiff has not shown that he was qualified for his position.

### 2. Adverse Employment Actions

Many of the discriminatory acts alleged by plaintiff do not constitute adverse employment actions. As the Second Circuit explained,

[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, signifi-

cantly diminished material responsibilities, or other indices ... unique to a particular situation. *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks and citations omitted).

■ Plaintiff complains that he was excluded from the performance evaluation process; denied compensation communication meetings; his services were underutilized; and his tardiness was unfairly scrutinized. The first two allegations, failure to participate in the PDP and denial of compensation communication meetings, simply do not rise to the level of actionable adverse employment actions. Courts have held that negative evaluations, standing alone without any accompanying adverse results, are not cognizable. *See Durant v. Nynex,* 101 F.Supp.2d 227, 233 (S.D.N.Y. 2000); *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 284 (S.D.N.Y.1999) ("Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment."), *aff'd,* 205 F.3d 1327, 2000 WL 232048 (2d Cir.2000); *Castro v. New York City Bd. of Educ. Pers.,* No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar.12, 1998) (negative evaluations "unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions"). If negative evaluations do not constitute adverse employment actions, *a fortiori* the complete absence of any evaluations is not cognizable. Therefore, whether plaintiff participated in the PDP or not is irrelevant as the lack of PDP participation, without more, is not an adverse employment action.[5] Exclusion from compensation communication meetings is also not an adverse

employment action. Such meetings merely inform the employee of his new level of compensation, they have "no effect on whether the associate receives an increase or on the amount of any such increase." Ross Aff. ¶ 15. Because the failure to have such meetings does not materially alter employment conditions, this claim is also not cognizable. Accordingly, both of these claims are dismissed.

Nor does plaintiff's alleged underutilization constitute an adverse employment action. Plaintiff does not complain of any change in job responsibilities, he merely complains that his services were not utilized to their fullest capacity. In *Galabya,* the Second Circuit found that a teacher's transfer from a special education, junior high school keyboarding class to a mainstream high school keyboarding class did not represent a change in responsibilities as to setback the teacher's career. *See id.,* 202 F.3d at 641. In *Castro,* the court dismissed plaintiff's discrimination claims, stating:

> [The principal's] decision to assign plaintiff to teach second grade and to place students with special needs in her class neither deprived plaintiff of an opportunity nor caused her to suffer any attendant negative result such as demotion, suspension or loss of wages. Nor did [the principal's] actions force plaintiff to perform duties outside the scope of her teaching contract or mark her as a less capable teacher.

*Castro,* 1998 WL 108004, at *8. *See also Henriquez v. The Times Herald Record,* No. 97 Civ. 6176, 1997 WL 732444, at *5 (S.D.N.Y. Nov.25, 1997), *aff'd,* 165 F.3d 14, 1998 WL 781781 (2d Cir.1998) (plaintiff's increased workload was not a materially adverse change).

---

5. There is some evidence, however, that plaintiff did in fact participate in the PDP, at least in 1999. *See* Bennett Dep. at 482 (Q: So you would agree that you had your full PDP for 1999? A: Yes. Except for the compensation communication meeting.).

Plaintiff was not transferred, nor were his job duties changed. He merely felt that he was not working to his fullest capacity. The nature of plaintiff's responsibilities remained the same but his workload allegedly decreased. Whether this was happenstance or an intentional decision on the part of Watson Wyatt is irrelevant because a decrease in workload, without any formal demotion or reduction in pay, does not constitute an actionable adverse employment action. Plaintiff's underutilization claim is therefore dismissed.[6]

Lastly, plaintiff claims that his chronic lateness was unfairly scrutinized. Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions. *See, e.g., Stembridge v. City of New York*, 88 F.Supp.2d 276 (S.D.N.Y.2000) (no actionable harm where "reprimand contained a warning that repetition of improper behavior could result in disciplinary action but contained no indication of any planned discipline or further action"); *Nicastro*, 60 F.Supp.2d at 186 (excessive scrutiny from supervisors and requiring documentation for sick leave could not support a Title VII retaliation claim); *Castro*, 1998 WL 108004, at *7 ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."); *Henriquez*, 1997 WL 732444, at *6 (unfair criticism of plaintiff's performance was not the type of employment action that courts have found to be materially adverse). While plaintiff may have been reprimanded repeatedly for his lateness, nothing came of these reprimands. Such criticism, without any other negative results such as a decrease in pay or being placed on probation, simply cannot support plaintiff's discrimination claims. Thus, plaintiff's excessive scrutiny claim is dismissed.

### 3. Inference of Discrimination

The only surviving adverse employment action is the denial of a raise in 1997. However, plaintiff does not present any evidence suggesting that this employment action was racially motivated. Plaintiff does not allege that he was subjected to racially derogatory comments, nor has he presented any other evidence of racial animus.

In an attempt to show discrimination, plaintiff makes comparisons to various white employees, none of whom are similarly situated.[7] In particular, plaintiff points to instances where black assistants replaced white assistants at lower salaries and where white assistants replaced black assistants at higher salaries. *See* Memorandum in Opposition to Summary Judgment at 1. While plaintiff's examples may be true, they do not evidence a practice or policy at Watson Wyatt of underpaying black employees as the converse is also true. For example, Heather Fester a non-black assistant earning $40,000 was replaced by Gail Joseph, a black administrative assistant, who received a starting salary of $45,000. *See* Supplemental Affidavit

---

**6.** Even if underutilization could be considered an adverse employment action, the claim would still be dismissed. Ironically, plaintiff's lateness, which may have contributed in part to his underutilization, rendered him unqualified for the position he held. Moreover, there is no evidence that this alleged underutilization was racially motivated. Plaintiff thus fails the second and fourth prongs of a prima facie case.

**7.** One of the most effective methods of establishing discrimination is to compare plaintiff's treatment to the treatment of employees outside the protected class. *See Bennett*, 1999 WL 165713, at *5 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817).

of Elizabeth Ross ("Ross Supp. Aff.") at ¶ 4. Veronica Bobadilla, a non-black assistant earning $38,000, was replaced by Intisar Abdul–Sami, a black administrative assistant earning $46,000. *Id.* Similarly, Elizabeth Forel, a non-black assistant earning $40,000, replaced Cassandra Glasco–Gueye, a black administrative assistant earning $41,000 who was promoted to an analyst position. *Id.* at ¶ 5.

Nor has plaintiff proffered any evidence that Watson Wyatt discriminates against its black employees with respect to salaries, raises or participation in PDP. Black and non-black assistants received comparable salaries and salary increases. Ross Aff. at ¶ 6. For example, Jacqueline Coles, Kathi Carter and Vanessa Tate, are black assistants who received raises of 50% to 25% of their starting salary over three to five year periods. *Id.* In 1996, 1997, 1998 and through March of 2000, black administrative assistants received the highest starting salaries. *Id.* at ¶ 8. As of March 2000, the two highest paid administrative assistants were black. *Id.* at ¶ 7. The same is true of participation in the PDP. Some black administrative assistants including Carol Ottley, Pauline Williams–Greasley and Jamela Adams participated in the PDP during their employment with Watson Wyatt. *Id.* at ¶ 13. Other black assistants did not participate in the PDP. *See* Plaintiff's Local Rule 56.1 Statement at ¶ 58. Several non-black assistants, including Iris Yaron, Katherine Mount and Elizabeth Forel, did not participate in the PDP during their time at Watson Wyatt. *Id.* at 14. These examples, by no means exhaustive, illustrate a parity between black and white workers at Watson Wyatt, thereby refuting any inference of race discrimination.

## C. Defendant's Nondiscriminatory Reason

▉▉▉▉▉ Watson Wyatt has presented a legitimate, nondiscriminatory reason for denying plaintiff a raise in 1997, namely, his unsatisfactory performance on the Nabisco project or, in plaintiff's view, Lofgren's perception of his poor performance.[8] Once the employer produces sufficient evidence to support a nondiscriminatory reason for its decision, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves,* 120 S.Ct. at 2106 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

▉▉▉▉▉ "Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' ..., or by reliance on the evidence comprising the prima facie case, without more...." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 38 (2d Cir.1994) (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089 and citing *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742). Plaintiff may also establish pretext by demonstrating that similarly situated employees outside of the protected class were treated differently. *See Francis v. Runyon,* 928 F.Supp. 195, 202 (E.D.N.Y.1996) (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817).

Employees are not similarly situated merely because their conduct might be

---

**8.** "Plaintiff's subjective perception that he received poorer performance reviews than he deserved does not constitute sufficient adverse employment action for purposes of stating a prima facie case." *Valentine,* 50 F.Supp.2d at 283. Furthermore, it is the decision-maker's perception, not plaintiff's, which is relevant. *See Belgrave v. Pena,* No. 98 Civ. 2517, 2000 WL 1290592, at *11 (S.D.N.Y. Sept. 13, 2000).

analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.

*Francis*, 928 F.Supp. at 203 (internal quotation marks and citations omitted).

■ Plaintiff's employment situation at Watson Wyatt was unique given his chronic tardiness and his performance on the Nabisco project. *See* Ross Supp. Aff. at ¶ 6 (no other administrative assistant arrived to work late nearly as often as plaintiff whose tardiness was, by far, "the most egregious"). Consequently, plaintiff cannot offer any evidence that a similarly situated white employee was treated differently than he.[9] Nor has plaintiff presented any other evidence that Watson Wyatt's stated basis for not providing him a raise in 1997 was pretextual. Thus, even if plaintiff had presented a prima facie case with regard to his raise claim, such claim would still be dismissed because he has failed to rebut Wyatt's legitimate, nondiscriminatory reason.

### D. Retaliation

■ "To establish a prima facie case of retaliation, a plaintiff must show that (1) he was engaged in protected activ-

ity; (2) the employer was aware of the activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Irvine v. Video Monitoring Servs. of Am., L.P.*, No. 98 Civ. 8725, 2000 WL 502863, at * 6 (S.D.N.Y. May 4, 2000) (citing *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998)). Here, the only actionable adverse employment action suffered by plaintiff was the denial of the raise. This action, however, preceded plaintiff's filing of an EEOC charge in May of 1998. Obviously, the denial of the raise could not have been retaliation for an act not yet taken. Furthermore, the excessive scrutiny of plaintiff's tardiness also preceded the filing of the EEOC charge.[10]

### E. Hostile Work Environment/Constructive Discharge

In his Amended Complaint, plaintiff alleges that Watson Wyatt created a hostile work environment, *see* Cmpl. ¶¶ 21–22, and that defendant's actions "were designed to and in fact forced plaintiff out of his job." Cmpl. ¶¶ 36, 38. Both the hostile work environment and constructive discharge claims must be dismissed as neither is supported by any evidence.

■ In order to prevail on a hostile work environment claim, a plaintiff must show that "the workplace is permeated with 'discriminatory intimidation, ridicule,

---

9. Plaintiff attempts to compare his lateness record with that of Susan Kersting and Iris Yaron, white administrative assistants. However, no other administrative assistants, including Kersting and Yaron, were late nearly as often as plaintiff. *See* Ross Supp. Aff. at ¶ 6. Moreover, Yaron, by agreement with her supervisor, works an eight hour day from 9:30 a.m. to 6:00 p.m., with one half-hour for lunch. *See id.* at ¶ 7.

10. The first counseling session occurred on March 12, 1998 and another took place a month later in April. The meetings that took place after plaintiff's filing of an EEOC charge were the result of plaintiff's continuing lateness, not of his filing. *See Castro*, 1998 WL 108004, at *9 ("It is unreasonable to infer that the continuation of behavior that had preceded the filing of plaintiff's complaint was somehow motivated by that complaint.").

and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *see also Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000). Here, plaintiff has not alleged any acts of racial discrimination (*e.g.,* derogatory comments, racial insults, ridicule) which would have had any effect on the workplace, much less alter it so significantly as to make it a hostile work environment. Whatever negativity plaintiff experienced was the result of his chronic lateness and not because of his race. Accordingly, plaintiff's hostile work environment claim is dismissed.

 The standard for constructive discharge is even higher. *See Stembridge v. City of New York,* 88 F.Supp.2d 276, 284 (S.D.N.Y.2000) ("Second Circuit has strictly construed the standard for determining whether working conditions are intolerable"). An employee is constructively discharged when his employer, rather than terminating him directly, deliberately makes working conditions so intolerable that the employee is forced into involuntary resignation.[11] *See Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 161 (2d Cir. 1998). Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person would have felt compelled to resign. *See Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996). As described by the Second Circuit,

[a] constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments.

\* \* \* \* \* \*

Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized.

\* \* \* \* \* \*

 Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant.

*Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993) (citations omitted). Thus, excessive scrutiny of job performance does not make out a claim for constructive discharge. *See Regis v. Metropolitan Jewish Geriatric Ctr.,* 97–CV–906, 2000 WL 264336, at *12 (E.D.N.Y. Jan.11, 2000). Nor does "[d]isagreement with management over the quality of one's performance." *Lindsay v. New York City Comm'n on Human Rights,* No. 94 Civ. 2595, 1997 WL 97834, at *4 (S.D.N.Y. 1997). Lastly, denials of promotions and raises, criticism of a plaintiff's work performance, and "alterations in, or an employee's dissatisfaction with, [his] responsibilities or assignments do not give rise to an inference of constructive discharge." *Ternullo,* 8 F.Supp.2d at 193; *see also Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1156 (2d Cir.1993) ("constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or

---

11. "This standard contains two separate elements: first, that the employer acted deliberately, and second, that the conditions were such that a reasonable employee in the plaintiff's shoes would have been compelled to resign... Whether a reasonable employee in the plaintiff's shoes would have felt compelled to resign is an objective determination based upon the conditions deliberately created by the employer." *Ternullo,* 8 F.Supp.2d at 190–91.

preferred not to continue working for that employer").

In order to state a prima facie case for constructive discharge, a plaintiff must first establish that he was constructively discharged under the standard set forth above and that the "constructive discharge 'occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in [a protected] class.'" *Irvine*, 2000 WL 502863, at *7 (quoting *Chertkova*, 92 F.3d at 91). Furthermore, the working conditions must be viewed as a whole, because "'[a] reasonable person encounters life's circumstances cumulatively and not individually.'" *Stembridge*, 88 F.Supp.2d at 284.

Plaintiff's claim for constructive discharge fails for two reasons. *First*, plaintiff has not alleged the type of severe working conditions that would support a claim of constructive discharge. The alleged negativity directed toward plaintiff was the result of his own actions, namely, his chronic lateness. Because plaintiff could have abated any further criticism by simply arriving to work on time, the involuntary aspect of constructive discharge is missing here. *Second*, plaintiff has not established that his working conditions were intentionally made miserable because of plaintiff's race. Accordingly, plaintiff's constructive discharge claim is dismissed.

### F. Section 1981

To establish a claim under § 1981, a plaintiff must show: (1) that he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one of the statute's enumerated activities—here the making and enforcing of contracts.[12] *See Lauture v. International*

*Bus. Machs. Corp.*, 216 F.3d 258, 261 (2d Cir.2000) (section 1981 provides a cause of action for racially discriminatory termination from at-will employment). The Second Circuit has emphasized "that an essential element of [the] cause of action is a requirement that the alleged discrimination took place because of the individual's race." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam).

Here, plaintiff has failed to satisfy the second and third prongs. Not only has plaintiff failed to establish an intent by Watson Wyatt to discriminate on the basis of his race, but he has failed to establish that any racial discrimination actually took place. Plaintiff's membership in a protected class, by itself, is not enough to sustain a § 1981 claim. Plaintiff's § 1981 claim is therefore dismissed.

## IV. CONCLUSION

Plaintiff has not established a prima facie case of race discrimination, nor has he offered any admissible proof that defendant's proffered legitimate, nondiscriminatory reason for not providing a raise was false. It is not enough simply to be a member of a protected class. To invoke the protections of Title VII, an employee must have actually suffered discrimination. To permit a plaintiff to consistently flout his employer's rules, voluntarily resign his employment, and then claim discrimination in a transparent attempt to fabricate a discrimination case will not be countenanced.

For these reasons, defendant's motion for summary judgment is granted and this case is dismissed. The Clerk of the Court is directed to close this case. A confer-

---

12. Section 1981(b) provides that the term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

ence to discuss the allocation of attorneys' fees is scheduled for March 26, 2001 at 2:30 p.m.

SO ORDERED.