## CONSTITUTIONAL LAW

### FREE EXERCISE CLAUSE – WHETHER JUDICIARY MUST ALLOW JUDGES TO TAKE ADMINISTRATIVE LEAVE FOR RELIGIOUS OBSERVANCE

December 21, 2015

*Ms. Pamela Harris*
*State Court Administrator*

You have asked, on behalf of the Administrative Office of the Courts, whether application of the Court's *Administrative Order on Judicial Absences from Court*, as amended March 24, 2014, results in unlawful discrimination on the basis of religion. Under the Court's amended judicial leave policy, a judge seeking to take time off for religious observances must use accrued annual or personal leave. In your opinion request, you indicate that one circuit court judge has requested another type of leave, administrative leave, for religious observances, partly because the judge wishes to preserve his or her accumulated annual or personal leave for other purposes.

Given the circuit judge's wish to use administrative leave for religious observance, you have asked for our opinion on two questions:

> Does the Administrative Order, as applied, result in unlawful discrimination on the basis of religion?

> Does the Court have an obligation to provide administrative leave to judges for religious holidays in addition to the accumulated leave authorized by Rule where other judiciary employees are likewise required to use accumulated leave for religious holidays?

As to your first question, our view is that the Court's judicial leave policy, because it is of general application and grants leave equally regardless of how a judge chooses to use the leave, does not discriminate on the basis of religion. Though some judges have religious obligations not shared by others, the Free Exercise Clause of the First Amendment does not require the judiciary to provide

additional leave to the religiously observant. Nor do we believe that the policy violates Article 36 of the Maryland Declaration of Rights, even if that provision were interpreted as providing greater protections for religiously-motivated conduct than its federal counterpart.

As to your second question, no federal or State law requires administrative leave for religious observance. Even under Title VII of the federal Civil Rights Act, which generally does not apply to judges, employers are not obligated to offer administrative leave for religious holidays if the employer's leave policy reasonably accommodates an employee's religious practices or if further accommodation would result in undue hardship for the employer. In our opinion, the thirty-three days of annual and personal leave available for religious observance would ordinarily be a sufficient accommodation for religious practice even under standards more protective of religious liberty than the Free Exercise Clause. Accordingly, we see no basis for concluding that, in addition to the paid leave available, the policy must also grant additional administrative leave for religious holidays that fall on scheduled work days.

# I

## Background

### A. *Judicial Leave Policy*

The Judiciary's leave policy regulates the circumstances under which Maryland State court judges may be absent from work. *Amended Administrative Order on Judicial Absences from Court* (January 21, 2010), as further amended March 21, 2014 ("Administrative Order"); *see also* Md. R. 16-104. Judges receive two forms of accrued leave: personal leave and annual leave. At the beginning of each calendar year, every judge is credited with six days of personal leave, which may be used for any purpose during that year. Personal leave may not be carried over into the next year; any unused personal leave is forfeited at the end of the year. *See* Md. R. 16-104(c); Admin. Order ¶ 23. Judges also receive annual leave, which accrues at the rate of twenty-seven days per year. Up to ten days of unused annual leave may be carried over into later years as accumulated annual leave, not to exceed twenty days in total. Accumulated annual leave must be used within three years or it is forfeited. Like personal leave, annual leave may be used for any purpose, including religious observances. *See* Md. R. 16-104(b); Admin. Order ¶¶ 10, 24.

In addition to the combined yearly allowance of thirty-three days of annual and personal leave, the Administrative Order authorizes additional, non-accruing paid leave for a variety of specific purposes, including holiday leave,[1] Admin. Order ¶ 15; sick leave, family-care leave, and bereavement leave, *id.*, ¶¶ 11, 25; leave to serve in the military and leave to serve as a disaster service volunteer or as a bone marrow or organ donor, *id.,* ¶¶13, 20, 21; leave for judicial education and speaking engagements, *id.,* ¶¶ 16, 22; leave for jury duty and to act as a witness in a legal action, *id.,* ¶¶ 17, 18; and leave for interviewing with a judicial nominating committee, legislative committee, bar association, or similar body considering the judge's nomination to another office, *id.*, ¶ 19. Some of these categories of leave are capped at a specific number of days, others not.

Finally, the Administrative Order provides for "administrative leave," which "may be granted for a variety of purposes, including jury duty, delayed opening or emergency/early release or closing." *Id.*, ¶¶ 2, 26. This leave category is a catch-all; "the Chief Judge of the Court of Appeals may grant a judge administrative leave for any other absence not specifically provided for by the Maryland Rules or this Order." *Id.*, ¶ 26. It is our understanding that the administrative leave available under this provision is paid leave; the Order does not authorize unpaid leave for any purpose.[2]

Requests for leave are submitted to the judge exercising administrative authority over the relevant court. When considering whether to grant a leave request, the administrative judge is directed to "be mindful of the necessity of retention of sufficient judicial staffing to permit, at all times, the prompt and effective disposition of [judicial] business." *Id.*, ¶ 5.d.(2)(c); *see also* Md.

---

[1] Holiday leave is limited to those holidays defined as "employee holidays" under § 9-201 of the State Personnel & Pensions Article: New Year's Day; Martin Luther King Day, Presidents' Day; Memorial Day; Independence Day; Labor Day; Columbus Day; Veterans' Day; Thanksgiving Day; American Indian Heritage Day (*i.e.*, the Friday after Thanksgiving Day); Christmas Day; statewide general election days; and "each other day that the President of the United States or the Governor designates for general cessation of business."

[2] You indicate in your request that the unavailability of unpaid administrative leave is based on the understanding that constitutional officers may not agree to a reduction in salary. *See Anne Arundel County v. Goodman*, 172 Md. 559 (1937); Md. Const. Art. IV, § 24.

R. 16-104(f). In general, requests for leave may be denied if granting leave would prevent "prompt and effective disposition of business," except that "personal leave requested for observance of a religious holiday may not be denied." Md. R. 16-104(f).[3]

The Judiciary's religious leave policy has evolved over time. Prior to March 24, 2014, we understand that at least one jurisdiction allowed judges to take paid administrative leave for religious observance where the number of religious holidays exceeded the number of authorized personal days. An amendment adopted on that date foreclosed this interpretation in two ways. First, it revised the term "Religious Observance Leave" to define it as a use of accrued annual or personal leave:

> "Religious observance leave" means <u>annual or personal</u> leave taken <u>pursuant to Maryland Rule 16-104,</u> in connection with a religious holiday <u>that is not a Judiciary holiday,</u> when a judge's religious beliefs require absence from court.

Administrative Order, ¶ 2.w (underlining indicates new language). Second, the 2014 amendment revised paragraph 24 of the Administrative Order, which governs the use of Religious Observance Leave:

> The appropriate administrative judge shall allow a judge to be absent from court on a religious holiday <u>that is not a Judiciary holiday</u> when required by the judge's religious beliefs. <u>A judge may use only annual or personal leave for this purpose, in accordance with the provisions of Maryland Rule 16-104.</u>

*Id.*, ¶ 24 (underlining indicates new language). The 2014 amendment thus specifies that absences for religious observances must be covered by the use of annual or personal leave.

---

[3] This aspect of the judicial rules differs from the rules applicable to employees within the State Personnel Management System, which allow for the denial of personal leave for religious observance under certain limited conditions. *See* Md. Code Ann., State Pers. & Pens. § 9-402(b)(2).

## B.    The Religion Clauses of the United States Constitution

The religious liberty clauses of the U.S. Constitution—the Establishment Clause and the Free Exercise Clause—are embodied in the First Amendment:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."    U.S. Const. amend. I.    In different ways, the Establishment Clause and Free Exercise Clause ensure governmental neutrality in matters of religion.    "The general principle deducible from the First Amendment" is that the Constitution "will not tolerate either governmentally established religion or governmental interference with religion." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669 (1970).  These guarantees, by operation of the Fourteenth Amendment, are also binding on the states. *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) ("The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws.").

The essence of the Establishment Clause guarantee is "that government should not prefer one religion to another, or religion to irreligion." *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 703 (1994).  Consistent with that principle, government may not organize its operations for the purpose of advancing religion.  But a law that confers an indirect or incidental benefit upon religion is not, for that reason alone, constitutionally invalid. *Lynch v. Donnelly*, 465 U.S. 668, 683 (1984).

The Free Exercise Clause protects against government action regulating religious beliefs or practices.  Free exercise of religion "embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell*, 310 U.S. at 303-04.  Thus, the Free Exercise Clause absolutely prohibits all "governmental regulation of religious *beliefs* as such." *Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 877 (1990) (internal quotation marks omitted, emphasis in original).  Religiously-motivated *conduct*, however, does not enjoy the same absolute protection. *Id*. at 879. Where a government regulation targets conduct because of its religious motivation, the regulation is subject to strict scrutiny and will be upheld only if it is narrowly tailored to advance a compelling government interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  But "a neutral, generally applicable law does not offend the Free Exercise Clause, even if the law has an incidental effect on religious

practice." *Hines v. South Carolina Dep't of Corr*., 148 F.3d 353, 357 (4th Cir. 1998) (citing *Smith*, 494 U.S. at 876-79).

## C. *Article 36 of the Maryland Declaration of Rights*

The Maryland Constitution also includes a guarantee of religious liberty in Article 36 of the Declaration of Rights. Article 36 ("Religious Freedom") provides:

> That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief, provided, he believes in the existence of God, and that under His dispensation such person will be held morally accountable for his acts, and be rewarded or punished therefor either in this world or in the world to come.

> Nothing shall prohibit or require the making reference to belief in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental or public document, proceeding, activity, ceremony, school, institution, or place.

> Nothing in this article shall constitute an establishment of religion.

The Court of Appeals has described Article 36 as "embod[ying]" the Free Exercise Clause of the First Amendment.[4] *See Archdiocese of Washington v. Moersen*, 399 Md. 637, 640 (2007); *see also* 94 *Opinions of the Attorney General* 81, 82 n.2 (2009) (observing that Article 36, "though differently worded," is "analogous" to the Free Exercise Clause, and that "an analysis of the 'free exercise' guarantee in Article 36 is generally similar to that under the First Amendment"). And when litigants do not distinguish between their claims under Article 36 and under the Free Exercise Clause, Maryland courts have sometimes assumed, without deciding, that Article 36 should be regarded as *in pari materia* with the Free Exercise Clause. *See, e.g., Supermarkets General Corp. v. State*, 286 Md. 611, 625 (1979); *see also Booth v. Maryland*, 337 F. App'x 301, 311 (4th Cir. 2009) ("Maryland state courts have proceeded on the basis that . . . Article 36 and the First Amendment of the United States Constitution have the same effect." (citing *Stover v. Prince George's County*, 132 Md. App. 373 (2000)). As a result, federal courts sometimes describe Maryland courts as "interpreting the free exercise and equal protection provisions of the Maryland Declaration of Rights *in pari materia* with their federal counterparts." *Bethel World Outreach Ministries v. Montgomery County*, 706 F.3d 548, 561 (4th Cir. 2013).

The Court of Appeals has not, however, expressly foreclosed the possibility that Article 36 might be interpreted differently from the Free Exercise Clause. *See Miles v. State*, 435 Md. 540, 557 (2013) (omitting Article 36 from list of provisions that have been read *in pari materia* with federal analogs); *see also* 69 *Opinions of the Attorney General* 92, 95-96 (1984). More generally, the Court of Appeals has cautioned that "Maryland law may impose greater limitations (or extend greater protections) than those prescribed by the United States Constitution's analog provisions." *Muskin v.*

---

[4] Apart from the obvious textual differences, Article 36 diverges from the First Amendment in two respects. First, it contains no express provision directly analogous to the Establishment Clause. *See Barghout v. Mayor & City Council*, 325 Md. 311, 327-28 (1992); *but see* Dan Friedman, *The Maryland State Constitution; A Reference Guide* 43, 303 n.242 (2006) (disagreeing with *Barghout* and describing ways in which Article 36 contains a "constellation of protections against the establishment of religion"). Second, the provisions of Article 36 requiring "belie[f] in the existence of God" to give evidence or serve on a jury have no analog in the First Amendment. The Court of Appeals has held, however, that those portions of Article 36 are invalid under the Establishment Clause of the U.S. Constitution. *Schowgurow v. State*, 240 Md. 121, 131 (1965).

*State Dep't of Assessments and Taxation*, 422 Md. 544, 556 (2011). "[S]imply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart." *Dua v. Comcast Cable of Maryland, Inc*., 370 Md. 604, 621 (2002) (emphasis in original).

## II

## Analysis

Your first question asks whether the judicial leave policy, as applied, results in unlawful religious discrimination. To answer that question, we must determine whether the policy, as applied to a judge whose religious obligations require the judge to be absent on some scheduled work days, violates the Free Exercise Clause. In our opinion, it does not. Moreover, even if Article 36 of the Maryland Declaration of Rights were found to offer greater protection for free exercise than does the federal constitution, the judicial leave policy would not result in unlawful discrimination or interfere with the free exercise of religion under the state constitution.

### A. *Federal and State Constitutional Guarantees of Religious Liberty*

### 1. The Free Exercise Clause

The primary task in assessing the constitutionality of governmental action under the Free Exercise Clause is to determine the appropriate level of scrutiny to be applied. Where the object of a law or policy is to restrict conduct because of its religious motivation, the law must undergo "the most rigorous of scrutiny"; the law will be upheld only in the "rare case[]" that it serves a compelling governmental interest "of the highest order" and is narrowly tailored to advance that interest. *Lukumi*, 508 U.S. at 546. On the other hand, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531; *see also Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 586 (2001). Laws that are neutral and of general applicability are subject to rational basis review, which requires only that the law be "rationally related to a legitimate government interest." *Bethel World Outreach*, 706 F.3d at 561 (citations and internal quotation marks omitted).

The "neutrality" and "general applicability" requirements are interrelated; "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. The shared aim of both inquiries is to identify government actions that target religiously-motivated conduct for unfavorable treatment while exempting or failing to reach the same conduct when undertaken for non-religious reasons. *See*, *e.g*., *id*. at 533 (explaining that non-neutral laws have as their object or purpose "the suppression of religion or religious conduct").

In our view, the policy on judicial leave must be regarded as both general and neutral with respect to religion. The Administrative Order applies to all judges without regard to their religious beliefs or practices, and it purports to regulate substantially all judicial absences, whether such absences are motivated by religious concerns or secular ones. All judges are entitled to the same amount of personal and annual leave, which they are free to use for any purpose, including religious ones. Additional paid absences are authorized under specific circumstances—for personal illness or family care, judicial or legal activities, military service, and similar reasons—that might arise for any judge without regard to his or her religious faith or practices. *Amended Administrative Order* ¶¶ 9-25 (rules regarding specific forms of leave). In short, the Administrative Order does not, on its face, selectively "impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543.

The judicial leave policy does depart from strict religious neutrality in one respect: it provides that a personal-leave request for religious observance may not be denied. However, not every reference to religion or religious conduct renders a law or policy constitutionally suspect and subject to strict scrutiny under the Free Exercise Clause. *See*, *e.g*., *Locke v. Davey*, 540 U.S. 712, 720-25 (2004) (declining to apply strict scrutiny to a State scholarship program that excluded students pursuing a theology degree when the disfavor of religion was slight and there was no animus toward religion evident in the text, legislative history, or operation of the program); *Bronx Household of Faith v. Board of Educ. of the City of New York*, 750 F.3d 184, 192-95 (2d Cir. 2014) (declining to apply strict scrutiny to a board of education rule prohibiting off-hour use of public school facilities for religious worship services). If the mere mention of religion triggered strict scrutiny, the neutrality test would be turned on its head, transforming any attempt to *accommodate* religious practices as evidence of an intent to *suppress* them. Here, the judicial leave policy's heightened protection for leave due to religious observance—whether or not

required by the Free Exercise Clause—does not indicate an anti-religious purpose that would warrant strict scrutiny.[5]

Although the Administrative Order is neutral on its face and applies to all judges, courts will also test the order for "substantial underinclusiveness." In other words, a regulation is not generally applicable if the government applies the restriction such that religion bears the burden of the rule. *See*, *e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1134 (9th Cir. 2009). *Lukumi* offers a good illustration. In that case, the City of Hialeah enacted a set of ordinances prohibiting animal sacrifice, ostensibly to protect public health and prevent cruelty to animals. 508 U.S. at 533-38. However, the ordinances were written and interpreted so that the only conduct effectively proscribed was the religious practice of Santeria church members, while "killings that are no more necessary or humane in almost all other circumstances are unpunished." *Id*. at 536. The failure to address so much similar conduct "disclose[d] an object remote from [the City's] legitimate concerns," namely, to accomplish a "religious gerrymander" against the Santeria religion. *Id*. at 535, 536 (internal quotation marks omitted).

We do not see in the judicial leave policy a comparable targeting of judicial absences due to a judge's religious duties. Rather, the Administrative Order plainly reaches judicial absences attributable to any number of secular motivations; it is not limited

---

[5] Nor do we think that the Administrative Order's heightened protection for religious observance violates the Establishment Clause, although this aspect of the Order demonstrates how the two clauses, while they "express complementary values," often "exert conflicting pressures." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). Laws such as Title VII that require reasonable accommodation of employees' religious practices are routinely upheld under the Establishment Clause on the grounds that they have the "primary secular effect of preserving the equal employment opportunities of those employees whose moral scruples conflict with work rules." *E.E.O.C. v. Ithaca Industries, Inc.*, 849 F.2d 116, 119 (4th Cir. 1988) (rejecting Establishment Clause challenge to Title VII). Similarly, the Supreme Court has observed that "it is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with our happy tradition of avoiding unnecessary clashes with the dictates of conscience." *Gillette v. U.S.*, 401 U.S. 437, 453 (1971) (rejecting Establishment Clause challenge to selective service exemption for conscientious objectors) (internal quotation marks and citations omitted).

to leave taken for religious observance or other religious reasons. And while additional, non-accruing leave is available for some specific secular purposes, the Administrative Order does not provide such leave for whatever non-religious reason a judge may choose to be away from court. The additional categories of authorized paid leave advance the administration of justice, promote the health of judges and their families, and facilitate or encourage particular kinds of community, public, or government service. Authorizing additional paid leave for these purposes thus either contributes directly to the effectiveness of the judiciary, or else temporarily excuses judges from their judicial duties in the interest of other forms of service that benefit the community. Unlike religious observance, which government may accommodate to some extent but cannot promote, the activities for which the policy authorizes additional paid leave fall within areas of legitimate governmental concern. The grant of leave for these legitimate purposes does not suggest an impermissible targeting of religious observance.[6]

Because the Administrative Order is general in its application and neutral toward religion, it is valid so long as it withstands rational basis review. *See Bethel*, 706 F.3d at 561. Regulating judicial absences rationally promotes a number of governmental interests. For example, the grant of annual and personal leave, totaling 33 business days in all presumably assures that judges have sufficient time away from the bench to maintain good health and effectiveness. Allocating such leave equally among all judges and establishing procedures for requesting and granting it facilitates the

---

[6] Although the Order thus appears to be sufficiently general in its ordinary application, one provision could raise at least a theoretical concern if applied improperly. Paragraph 26 provides that, subject to the general policy on staffing and the procedures for submitting leave requests, "the Chief Judge of the Court of Appeals may grant a judge administrative leave for any other absence not specifically provided for by the Maryland Rules or this Order." We have no information about how this discretionary power has been interpreted or applied, or on what basis the Chief Judge might grant administrative leave outside the Order. But if the provision is understood to allow individualed, discretionary exceptions from the general restrictions of the judicial leave policy, it would have to consider requests for religious leave upon the same conditions as other, non-religious requests, absent a compelling justification. *Smith*, 494 U.S. at 884; *Lukumi*, 508 U.S. at 537; *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004); *cf. Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71 (1986) (noting that, "when paid leave is provided for all purposes except religious ones," the arrangement discriminates against religious practices for purposes of Title VII).

scheduling of the court's business and the equitable distribution of cases. *See* Admin. Order, ¶ 5.d.(2)(c) ("prompt and effective disposition" of court business); Md. R. 16-104(f). As mentioned above, other kinds of non-accruing paid leave—such as for legal education, attendance at judicial conferences, and similar events—contribute directly to the improvement of law and administration of justice, or increase public understanding of the judicial system. Sick leave, among other things, promotes judicial effectiveness by enabling judges to attend to their own health and the health of their family members. Lastly, administrative leave is available to facilitate specific kinds of charitable, public, or government service, such as donating organs or bone marrow, giving aid during disasters or public emergencies, or serving in the military. The judicial leave policy rationally serves all of these legitimate government interests and thus satisfies the rational basis test.

Our conclusion that the Order does not offend the Free Exercise Clause is also consistent with the well-settled principle that the clause, while it protects against governmental interference with religious practices, offers no basis for claims to additional benefits as compared to those provided to members of other faiths or to those who are not religiously observant. *See*, *e.g*., *United States v. Friday*, 525 F.3d 938, 957 (10th Cir. 2008). As the federal courts have explained:

> The crucial word in the constitutional text is "prohibit." For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government. Put differently, this clause provides protection from certain forms of governmental compulsion, but generally does not provide a basis for demands for affirmative governmental assistance.

*Trinity Lutheran Church of Columbia, Inc. v. Pauley*, 976 F. Supp. 2d 1137, 1146 (W.D. Mo. 2013) (internal quotation marks and citations omitted); *see also Bronx Household of Faith*, 750 F.3d at 191 ("The Free Exercise Clause . . . has never been understood to require government to finance a subject's exercise of religion[.]"). Non-discrimination under the Free Exercise Clause does not require the government or employer to bear the cost, in the form of additional leave benefits, of incidental burdens resulting from a religious believer's observance of religious duties.

Even under Title VII—which *does* impose affirmative obligations on employers to accommodate religious practices—no employer, public or private, is required to grant an accommodation that imposes more than *de minimis* cost on the employer or others. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977). While offering extra benefits may, in some circumstances, be necessary to accommodate religious practices under that statute, *see E.E.O.C. v. Abercrombie & Fitch Stores, Inc*., 135 S. Ct. 2028, 2034 (2015), the Free Exercise Clause does not mandate it.

Inevitably, in a religiously diverse society, the judicial calendar will not correspond precisely with every judge's religious obligations. But the existence of this disparate impact on members of different faiths is the starting point for Free Exercise Clause analysis, not a violation in itself. The test prescribed in *Smith* assumes that such disparities will occur, but holds them unobjectionable so long as they result from a religion-neutral, generally-applicable rule. *See Smith*, 494 U.S. at 876-79; *see also Hines*, 148 F.3d at 357 (observing that, under *Smith,* "a neutral, generally applicable law does not offend the Free Exercise Clause, even if the law has an incidental effect on religious practice").

We are not aware of any case involving a Free Exercise challenge to a leave policy similar to the one here, but courts have routinely upheld similar policies against challenges brought under other statutory and constitutional theories. In doing so, the courts have rejected disparate impact arguments similar to the one suggested by your question. For example, in *Tepper v. Potter*, 505 F.3d 508 (6th Cir. 2007), a Jewish letter carrier sued the Postmaster General under Title VII, alleging that the government discriminated against him by including him in the rotating Saturday schedule, when his faith prohibited him from working, while no employees were assigned Sunday work. The "Sunday off" policy, he argued, enabled non-Jewish employees to observe their Sabbath, while he could observe his. *Id* at. 517. In upholding the policy, the Sixth Circuit noted that the reason letter carriers were not assigned to work Sundays was because of the light workload on that day, not because Sunday was the Sabbath for some employees. *Id.* The "Sunday off" policy thus had a secular purpose; its aim was not to allow or encourage Sabbath observance.[7] For that reason, requiring

---

[7]  In fact, had the policy been designed to promote Sunday worship, it likely would have run afoul of the Establishment Clause. In *Estate of Thornton v. Caldor, Inc*., 472 U.S. 703 (1985), for example, the Court struck, as a violation of the Establishment Clause, a Connecticut Sabbath observance law that gave every employee an unqualified right to refrain

carriers to accept rotating assignments on Saturdays, but not Sundays, did not discriminate on the basis of religion.

A similar argument was rejected in *Koenick v. Felton*, which involved claims under the Establishment Clause and Equal Protection Clause. 973 F. Supp. 522 (D. Md. 1997), *aff'd* 190 F.3d 259 (4th Cir. 1999). There, a Montgomery County public school teacher challenged the constitutionality of a Maryland statute creating a public school holiday from "[t]he Friday before Easter and from then through the Monday after Easter." Md. Code Ann., Educ. § 7-103(c)(1)(v) (2014 Repl. Vol.). She alleged that this holiday violated the Establishment Clause and equal protection because, as an observant Jew, she was obliged to use personal leave days or leave without pay to observe certain religious holidays, such as Passover, while the holiday schedule gave practicing Christians paid leave to observe their religious holidays, without need to use personal leave. The district court concluded, however, that the statute has a secular purpose: The statute simply provided a four-day weekend over a period "when there is a high probability of absenteeism." *Id*. at 528. The court also concluded that the Equal Protection Clause did not apply because there was no unequal treatment of similarly situated persons; all teachers were given the same days off with pay. *Id.* at 530. This equality of treatment was not changed by the "ancillary fact" that some Christians may observe Good Friday as a religious holiday. *Id*.

Though decided on other grounds, the reasoning of these cases is consistent with our conclusion under *Smith* and *Lukumi*, that in providing equal personal and annual leave to all judges regardless of their religious obligations, the judicial leave policy is consistent with the Free Exercise Clause. We next consider whether the policy is consistent with Article 36 of the Maryland Declaration of Rights.

## 2.    Article 36 of the Maryland Declaration of Rights

Whether the amended judicial leave policy is consistent with Article 36 depends in part on whether the State constitutional provision is read *in pari materia* with the Free Exercise Clause. If the two provisions mean the same thing, then the conclusion we reach above would hold true as a matter of State law as well. But

---

from work on the weekday the employee designated as a Sabbath. The Court held that the primary effect of the law was not secular, but that of advancing religion.

given that the Court of Appeals has not foreclosed the possibility that Article 36 might be interpreted differently from its federal counterpart, we must also evaluate the constitutionality of the Administrative Order under an alternative State-law standard. Although this inquiry necessarily involves some speculation about how the Court of Appeals will interpret Article 36 if not *in part materia* with the Free Exercise Clause, one interpretation presents itself as the most likely candidate: The "substantial burden" standard articulated by the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398 (1963).

*Sherbert* was the prevailing precedent before it was "eviscerated" by *Smith* in 1990. *See* 79 *Opinions of the Attorney General* 45, 49-50 (1994); *see also Lukumi,* 508 U.S. at 531 (explaining the law after *Smith*). "Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest." *Smith*, 494 U.S. at 883; *see Sherbert*, 374 U.S. at 402-03. Thus, where *Smith* now applies the rational basis test to all neutral and generally-applicable governmental actions, *Sherbert* would apply strict scrutiny if those actions incidentally impose a "substantial burden" on religion.[8]

Maryland cases decided prior to 1990 seem to have followed an analytical approach similar to that taken in *Sherbert*. In *McMillan v. State*, 258 Md. 147 (1970), for example, a defendant who refused on religious grounds to remove a religious head covering known as a "filaas" was cited for contempt. The Court of Appeals concluded that wearing the filaas did not undermine the State's compelling interest in maintaining decorum and respect and therefore reversed the order. *Id*. at 152-53 (citing *Sherbert*). The Government's demand that the religious objector conform to a neutral, general rule was evaluated not under the rational basis test—as would be the case under *Smith*—but in relation to a compelling State interest, suggesting that the Court was applying a standard analogous to the *Sherbert* test. The Court of Special

---

[8]   As Judge Harrell has described, there appear to be two schools of thought about how much of *Sherbert* survives, as a matter of federal law, after *Smith*. *Neustadter v. Holy Cross Hosp. of Silver Spring, Inc*., 418 Md. 231, 257-59 (2011) (Harrell, J. concurring). One school sees *Sherbert* as applicable "only to those cases involving individualized exemptions vis á vis a system of unemployment benefits." *Id.* at 257. The other school—and the one that Judge Harrell indicates "has garnered the most support," *id.* at 258—maintains that *Sherbert* continues to apply to "all individualized exemptions, and not only to those involving unemployment benefits." *Id.*

Appeals in *Snyder v. Holy Cross Hospital*, 30 Md. App. 317 (1976), addressed *Sherbert* specifically, noting that it "is in accord with the law as we have found it to be" under Article 36. The intermediate appellate court held that the State's compelling interest in determining the cause of death for a seemingly-healthy eighteen-year-old man outweighed the father's religious objections to an autopsy. *Id*. at 330-31. And in *Levitsky v. Levitsky*, 231 Md. 388, 397-98 (1963), Article 36 did not grant to a parent the right to refuse necessary medical care to her child based on the parent's religious convictions, given the gravity of the consequences. Thus, the Maryland appellate courts have evaluated the Government's demand that the religious objector conform to a neutral, general rule in relation to a State interest asserted to be compelling, suggesting a free exercise standard equivalent to that articulated in *Sherbert*.

After the Supreme Court decided *Smith*, the Court of Appeals appears to have moved away from the *Sherbert* test when discussing Article 36. The Court of Appeals in *Moersen*, 399 Md. at 640-41, and *Montrose*, 363 Md. at 585, cited *Smith* and *Lukumi* in discussing the scope of religious protection under both the Free Exercise Clause and Article 36, suggesting that *Sherbert* no longer provides the appropriate constitutional framework. But neither *Moersen* nor *Montrose* involved incidental burdens arising from neutral requirements of general applicability. Instead, both cases dealt with Title VII and the so-called "ministerial exception," which exempts from that statute's reach employment decisions involving employees whose "'primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship.'" *Moersen*, 399 Md. at 644 (quoting *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)); *Montrose*, 363 Md. at 590. Given the different context of those cases, we do not necessarily read into the Court's statements a broader endorsement of *Smith* as the guiding precedent for Article 36.

Because we cannot say with confidence that *Smith* would control here, we also consider the possibility that the Court might continue to apply the more demanding constitutional standard articulated in *Sherbert*. For reference points on how to apply that standard we have the cases discussed above that appear to have followed *Sherbert*, but we also have the cases applying the Religious Freedom Restoration Act of 1993 ("RFRA"). That Act

is not applicable to the states,[9] but because it was intended to codify and "restore the compelling interest test as set forth in *Sherbert*" and its progeny, 42 U.S.C. § 2000bb(b)(1), cases decided under RFRA provide useful guidance in the event that Maryland courts continue to follow *Sherbert*. RFRA provides, in relevant part:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling interest.

42 U.S.C. § 2000bb-1(b). Thus, as under *Sherbert* and the pre-*Smith* Free Exercise Clause cases, not every incidental burden on the exercise of religion violates RFRA, only burdens that are "substantial." *Cf. Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *Smith*, 494 U.S. at 883. A "substantial burden" exists when government action puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Board of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981).

Applying the more demanding *Sherbert*/RFRA test to the scenario described in your question, we still find it unlikely that a judge's need to use accrued personal and annual leave for religious observance would create "substantial pressure" to violate his or her beliefs. After all, he or she has at least thirty-three days—six and a half weeks—of combined annual and personal leave, and perhaps more if accrued leave is carried over from the prior year. Although a judge might prefer to preserve all of that leave for vacation and non-religious pursuits, how the judge uses leave is ultimately up to

---

9    The provisions of RFRA were intended to cover both federal and state governments, but in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court invalidated RFRA as applied to the States and their political subdivisions, holding that the Act was beyond the remedial powers of Congress under the Fourteenth Amendment. In response, Congress enacted the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, as a "reprisal" of RFRA, though with a more limited focus on certain types of decisions that impose a substantial burden on religious exercise. *See Trinity Assembly of God of Baltimore City v. People's Counsel for Baltimore County*, 407 Md. 53, 88-89 (2008).

the judge. What an observant judge gives up under the judicial leave policy is thus not one or more days of leave, but a flexibility in how to *use* the leave allotted.

The case law shows that the loss of that flexibility is not a burden of constitutional consequence. For example, the district court in *DiPasquale v. Board of Educ., Williamsville Cent. Sch. Dist.*, 626 F. Supp. 457, 459 (W.D.N.Y. 1985), reached that conclusion with respect to a collective bargaining agreement that provided employees with various kinds of leave, including "family leave," on certain religious holidays. The agreement permitted the plaintiff to use one of only a limited number of personal days for an absence on a religious holiday that was not covered by the agreement. The court in *DiPasquale* concluded that the use of a personal day, which the plaintiff might have used otherwise, to observe religious holidays was a "minimal infringement" on free exercise that "cannot be said to rise to the level of a constitutional violation." *Id.* at 459.[10]

The infringement at issue here—a diminution in one's options about on how to use leave benefits—also seems less of a burden on free exercise than the policies that appear to have triggered strict scrutiny in *Snyder* and *MacMillan*, where the State specifically required observant individuals to take actions *prohibited* by their religious faith. Only where the days needed for religious leave exceeds all available leave is there any potential for direct interference with a judge's religious practices. But even then, the *Sherbert* analysis would require a court to determine whether the state's interests in the "prompt and effective disposition of [judicial] business," Md. R. 16-104(f), and in the equitable division of the courts' workload among all judges, would justify imposing a reasonable limit on judicial leave. In our view, the total number of annual and personal leave days allowed does not appear to be unreasonably restrictive. In short, we do not think that the loss of choice over a portion of one's accrued leave would create "substantial pressure" on an individual to act contrary to their

---

[10] Compare *Braunfeld v. Brown*, 366 U.S. 599 (1961), upholding Pennsylvania's Sunday closing law as applied to Jewish storeowners who closed for business on Saturday to observe the Sabbath. Though the burden was indirect, the law made the practice of the storeowners' religious beliefs more expensive. The Supreme Court acknowledged that, although the alternatives facing the plaintiffs "may well result in some financial sacrifice in order to observe their religious beliefs, still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful." *Id.* at 606.

religious convictions. We therefore conclude that, even assuming Article 36 were interpreted in line with *Sherbert* and RFRA, the judicial leave policy does not impose impermissible burdens on the free exercise of religion.

## B. *Whether the Judiciary Must Provide Administrative Leave for Judges' Religious Observance*

You also asked whether paid or unpaid administrative leave for religious holidays must be provided for judges even though such leave is unavailable to any other judiciary employees. Given our conclusion that the Administrative Order, without offering such leave, does not discriminate on the basis of religion under either the Free Exercise Clause or Article 36, we see no constitutional duty to offer judges the additional option of taking administrative leave. As discussed above, those constitutional provisions speak in terms of "what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Lyng v. Northwest Indiane Cenetery Protective Ass'n*., 485 U.S. 439, 451 (1988) (quoting *Sherbert*, 374 U.S. at 412 (Douglas J., concurring)).

Nor are we aware of any other legal requirement that would compel the Judiciary to accommodate the religious needs of judges through the particular mechanism of paid or unpaid administrative leave. Even where Title VII imposes an affirmative obligation to "reasonably accommodate" an employee's religious practices, the manner of accommodation is up to the employer, despite the employee's preference for a different form of accommodation. *See*, *e.g*., *Ansonia Bd. of Educ.*, 479 U.S. at 68.

Although judges who stand for retention, like other elected public officials, are not "employees" within the meaning of Title VII, *see* 42 U.S.C. § 2000e(f),[11] the reasoning applied in the Title

---

[11] Title VII, in relevant part, defines "employee" to exclude:

any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a

VII context sheds light on what sorts of employment policies are regarded by courts as reasonable ways to accommodate employees' religious practices.

Under Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1); *Westbrook v. North Carolina A & T State Univ.*, 51 F. Supp. 3d 612, 618 (M.D.N.C. 2014). "Religion" is defined to "includ[e] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate" an employee's "religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Title VII protects against both disparate treatment on the basis of religion *and* an employer's

---

State government, governmental agency or political subdivision.

42 U.S.C. § 2000e(f); *see also* Md. Code Ann., State Gov't Article § 20-601(c)(2) (providing the same exclusion from State law regulating discrimination in employment).

Circuit court and appellate judges must stand for retention in a general election, Md. Const., Art. IV, §§ 3, 5A; and they are not part of Maryland's civil service system. *See* Md. Code Ann., State Pers. & Pens. §§ 6-303 (excluding from the State Personnel Management System all positions in the Judicial Branch, except as otherwise provided by law); 6-301 (excluding elective positions and positions provided for by the Maryland Constitution). They therefore do not qualify as "employees" for purposes of Title VII. *See Gupta v. First Judicial Dist. of Pennsylvania*, 759 F. Supp. 2d 564 (E.D. Pa. 2010) (state judge's law clerk was "personal staff" of elected official and thus not an employee covered by Title VII); *Bland v. New York*, 263 F. Supp. 2d 526 (E.D.N.Y. 2003) (judge's personal secretary excluded from Title VII coverage as "personal staff" of elected official). District court judges, though not elected, are also excluded from the definition as "appointee[s] on the policymaking level." *Gregory v. Ashcroft*, 501 U.S. 452 (1991) (interpreting similar language to exclude state judges from coverage under the federal Age Discrimination in Employment Act); *Spann-Wilder v. City of North Charleston*, 2010 WL 3222235 (D.S.C.) (appointed municipal judge not covered under Title VII); *see* 76 *Opinions of the Attorney General* 81 n.1 (1991) (concluding that standing masters, but not district court judges, are protected under the ADEA).

failure to reasonably accommodate the employee's religious observance or practice. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017-18 (4th Cir. 1996). Thus, in addition to barring unequal treatment on the basis of religion, Title VII imposes upon the employer a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Hardison*, 432 U.S. at 75. Like the heightened protections of RFRA, this affirmative duty to reasonably accommodate an employee's religious practices requires more than the neutrality toward religion demanded by the Free Exercise Clause.

In general, courts have considered the reasonableness of an accommodation to be a fact-specific inquiry requiring examination of the totality of circumstances, including the cost to the employer and co-workers, the nature of the employee's religious beliefs, and any conflict with the employee's work duties. *See, e.g.*, *Sánchez-Rodríguez v. AT&T Mobility Puerto Rico*, 673 F.3d 1, 12 (1st Cir. 2012); *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 313 (4th Cir. 2008). But beyond that, the courts have varied considerably about what constitutes a "reasonable" accommodation. Some courts have held that an accommodation that entirely removes the conflict between work requirements and the employee's religious obligations, if applied in a religion-neutral manner, is always a reasonable accommodation as a matter of law. *Sturgill v. United Parcel Service*, 512 F.3d 1024, 1030-31 (8th Cir. 2008); *see also Porter v. City of Chicago*, 700 F.3d 944, 951-53 (7th Cir. 2012) (an accommodation that eliminates the religious conflict is reasonable, whether or not it is the employee's preferred accommodation); *Telfair v. Federal Express Corp.*, 934 F. Supp. 2d 1368, 1384 (S.D. Fla. 2013) (same). Under that standard, courts have found that the availability of paid or unpaid leave for religious holidays or Sabbath observance is generally a permissible way to eliminate the religious conflict, and thus reasonably accommodate an employee, even if the employee feels that requiring leave to eliminate religious conflicts is unfair or coercive. *See, e.g.*, *Abdelkader v. Sears, Roebuck & Co.*, 780 F. Supp. 2d 389, 395 (D. Md. 2011); *see also Durant v. NYNEX*, 101 F. Supp. 2d 227, 233-34 (S.D.N.Y 2000).

The United States Court of Appeals for the Sixth Circuit, however, has held that an accommodation is *not* reasonable if it resolves the religious conflict only by requiring the employee to use all of the employee's paid-leave entitlement, reasoning that the employee "stands to lose a benefit, vacation time, enjoyed by all other employees." *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379

(6th Cir. 1994); *see also Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629 (6th Cir. 2003). But that does not reflect the rule in the Fourth Circuit. Instead, the Fourth Circuit has held that vacation leave provided under the employer's standard leave plan is a permissible means to reasonably accommodate an employee's religious practices, not an employment benefit that is "lost" through the employee's use of it for religious observance. *See*, *e.g.*, *Firestone*, 515 F.3d at 315; *E.E.O.C. v. Thompson Contracting, Grading, Paving, and Utilities, Inc.*, 499 Fed. App'x. 275 (4th Cir. 2012).

In *Firestone*, the plaintiff's religious beliefs prohibited him from working on the Sabbath and on fourteen workdays that fell within religious holidays. Although the employer's collectively-bargained attendance package included fifteen vacation days, three "floating holidays," and sixty hours of unpaid leave, the total number of days off were still inadequate to completely accommodate the plaintiff's religious needs, and he was terminated after he exceeded the leave available under the policy. The *Firestone* court concluded that Title VII requires only "reasonable," but not necessarily "total," accommodation of an employee's religious practices and found that the accommodations offered were reasonable. 515 F.3d at 315-16. In contrast to the Sixth Circuit's reasoning in *Cooper*, the Fourth Circuit in *Firestone* viewed the employee's use of all the leave available to him exclusively for Sabbath and holy day observance as part of the accommodation actually provided, not as a loss of leave benefits based on his religion. *Id.* at 315-16 ("pre-existing company policies" concerning seniority, leave, and shift-swapping qualified as reasonable accommodations).

In our opinion, most courts would usually regard the judicial leave plan as a reasonable method of accommodating an employee's need for time off for religious observance. A total of thirty-three paid leave-days is ordinarily available for this purpose, including six personal days for which leave on account of religious observance may not be denied. Even if a judge were compelled to use all available paid leave to eliminate conflicts with religious duties, the leave offered would not be unreasonable for that reason alone. Indeed, the *Firestone* court did not order the employer to provide unpaid leave beyond the limits of the collective-bargaining agreement, even though the standard accommodation package fell short of completely resolving the employee's religious conflicts. Given that outcome, the possibility that a court would hold that Title VII requires unpaid leave solely to allow an individual to

preserve his or her annual leave for other, non-religious purposes seems remote.

We need not decide whether the Judiciary would have to offer additional administrative leave as a reasonable accommodation under Title VII; that statute does not apply to most judges. But the likelihood that additional leave would not be necessary as a reasonable accommodation under Title VII reinforces our conclusion that it would not be necessary under the Free Exercise Clause either. As discussed above, that constitutional provision "provides protection from certain forms of governmental *compulsion*"; it "generally does not provide a basis for demands for affirmative governmental assistance." *Trinity Lutheran*, 976 F. Supp. 2d at 1146.

## III

## Conclusion

The Court's judicial leave policy, because it is of general application and grants leave equally regardless of how a judge chooses to use the leave, does not discriminate on the basis of religion. Though some judges have religious obligations not shared by others, the Free Exercise Clause of the First Amendment does not require the judiciary to provide them with additional leave. Nor do we believe that the Administrative Order violates Article 36 of the Maryland Declaration of Rights, even if that provision were interpreted as providing greater religious protections than its federal counterpart. The infringement at issue here—a diminution in one's choices on how to use leave benefits—does not create "substantial pressure" on an individual to act contrary to his or her religious convictions.

Finally, no federal or State law requires the Judiciary to provide administrative leave for religious observance. Even under Title VII, which does not apply to judges, employers are not obligated to offer administrative leave for religious holidays if the employer's leave policy reasonably accommodates an employee's religious practices. In our opinion, the six and a half weeks of annual and personal leave available for religious observance would ordinarily be regarded as a sufficient accommodation for religious practice even under standards more protective of religious liberty than the Free Exercise Clause. Accordingly, we conclude that, in addition to the paid leave available, the policy need not grant additional administrative leave for religious holidays that fall on scheduled work days.

Brian E. Frosh
Attorney General of Maryland

Jeffrey L. Darsie
Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice